IN RE APPLICATION OF CITY OF LEXINGTON, NEBRASKA.
CITY OF LEXINGTON, NEBRASKA, APPELLEE AND
CROSS-APPELLANT, V. DAWSON COUNTY PUBLIC POWER DISTRICT,
APPELLANT AND CROSS-APPELLEE.
504 N.W.2d 532

Filed August 20, 1993.   No. S-91-450.

Bruce Smith, of Stewart & Smith, and Steven E. Guenzel, of Barlow, Johnson, DeMars & Flodman, for appellant.

Willard Weinhold, Lexington City Attorney, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

HASTINGS, C.J.

The Dawson County Public Power District (Dawson) appeals from an order of the Nebraska Power Review Board (Board) which determined the total economic impact of transferring an electrical service area from Dawson to the City of Lexington (Lexington) under the provisions of Neb. Rev. Stat. § 70-1010 (Reissue 1990) and ordered the payment by Lexington to Dawson of $596,809. Lexington cross-appeals.

Neb. Rev. Stat. § 70-1016 (Reissue 1990) provided that an

appeal may be taken to the Supreme Court from any final action of the Board in the same manner as appeals are taken from decisions of the Public Service Commission.

In the case *In re Complaint of Federal Land Bank of Omaha,* 223 Neb. 897, 395 N.W.2d 488 (1986), this court held that an action of the Public Service Commission will be affirmed on appeal if it is supported by evidence in the record and is not arbitrary, capricious, or otherwise illegal; and thus, the same standard of review applies to decisions of the Board, i.e., if they are supported by the evidence and are reasonable and not arbitrary, they are to be affirmed. It is quite apparent from that rule that this court cannot set itself up as a super-administrative body and reach its own conclusion without regard to that made by the Board.

On January 22, 1990, Lexington, pursuant to Neb. Rev. Stat. § 70-1008 (Reissue 1990), filed an application with the Board to transfer newly annexed territory to its electric service area. That section provides in part that a municipally owned electric system serving such municipality at retail shall have the right upon application to and approval by the Board to serve newly annexed areas of such municipality. An annexation of a certain area has taken place, and there is no dispute as to Lexington's right to serve this annexed area.

However, the parties unsuccessfully attempted to agree, under the provisions of § 70-1010, upon the value of the annexed certified service area, distribution facilities, and customers of Dawson being transferred to Lexington.

Therefore, further application was made by Lexington to have the Board determine the total economic impact which transferring the territory would have on the area's current electric supplier, Dawson. Dawson joined in that application. The Board requested that, pursuant to § 70-1010, the parties submit information as to what costs would be incurred by Dawson if the transfer of the area in question took place.

Section 70-1010(2) provides:

> In the event of a proposed transfer of customers and facilities from one supplier to another in accordance with this section or section 70-1008 or 70-1009, the parties shall attempt to agree upon the value of the certified service

area and distribution facilities and customers being transferred. If the parties cannot agree upon the value, then the board shall determine the total economic impact on the selling supplier and establish the price accordingly based on, but not limited to, the following guidelines: The supplier acquiring the certified service area, distribution facilities, and customers shall purchase the electric distribution facilities of the supplier located within the affected area, together with the supplier's rights to serve within such area, for cash consideration which shall consist of (a) the current reproduction cost if the facilities being acquired were new, less depreciation computed on a straight-line basis at three percent per year not to exceed seventy percent, plus (b) an amount equal to the nonbetterment cost of constructing any facilities necessary to reintegrate the system of the supplier outside the area being transferred after detaching the portion to be sold, plus (c) an amount equal to two and one-half times the annual revenue received from power sales to existing customers of electric power within the area being transferred . . . . After the board has determined the price in accordance with such guidelines, the acquiring supplier may acquire such distribution facilities and customers by payment of the established price within one year of the final order.

Lexington and Dawson entered into a stipulation agreeing on the value of two components of the above valuation. They agreed that the appropriate figure for the current reproduction cost of facilities being acquired, in accordance with § 70-1010(2)(a), was $92,423 and that the nonbetterment cost of reintegration, under subsection (2)(b) of the statute, was $21,873.

Lexington and Dawson also agreed that the annual revenue from the customers in the area to be transferred was $108,660.83, but were unable to agree upon how this figure was to be applied. At a hearing before the Board, Lexington's expert testified that multiplying the annual revenue figure by $2\frac{1}{2}$, pursuant to subsection (2)(c) of § 70-1010, would produce a figure which when added to the figures determined under

§ 70-1010(2)(a) and (b) would represent the total economic impact of the acquisition of the service area by Lexington. However, Dawson adduced testimony that this figure would not provide adequate compensation.

Economist Donald Macke testified that he had considered potential growth in the area in calculating present and future net revenue losses and determined that the necessary lump-sum payment to compensate Dawson for that loss would be $653,345. In addition, Dawson's general manager, Phillip Darby, testified that a transmission line substation and feeder circuits which provided service to the area would be partly idled by the loss of the load of the annexed area, requiring compensation of $97,271. Darby also testified in regard to the increased cost of power due to the loss of the load in the annexed area, referred to as the "ratchet impact." As explained by Darby, the ratchet impact in this case results from the fact that Dawson must build and maintain a system capable of supplying electric service to more than 3,800 irrigation customers for 2 or 3 months of the year. The ratchet charge is a component of the wholesale power contract under which Dawson purchases power, requiring that a percentage of the maximum peak established during the period of high usage must be purchased for the remaining months of the year. Darby stated that because the annexed area is a winter-peaking load, the loss of that load would substantially and materially affect the ratchet cost Dawson pays, resulting in additional annual ratchet costs of $13,030, or a total of $196,679.

Following the hearing, the Board issued an order that Lexington should pay Dawson the sum of $596,809 for the service area and facilities which would be acquired. This figure included both of the stipulated valuations under § 70-1010(2)(a) and (b); the full amount claimed by Dawson for the equipment and materials rendered useless by the transfer; the reduced figure of $113,589 for the ratchet impact; and a loss of revenue figure of $271,653, determined by multiplying the transferred area's yearly revenue by 2$^1/_2$, as provided by § 70-1010(2)(c).

On February 1, 1991, Dawson filed with the Board a motion for rehearing, which was overruled on March 22. Dawson now

appeals to this court, contending that it should receive its submitted figure of $1,061,591 for the service area and asserting that the Board erred in (1) accepting Lexington's calculations regarding the average duration of ratchet billing of Dawson by its supplier, accepting Lexington's projections on the expected increases of the demand rate, and accepting Lexington's suggested discount rate; and (2) accepting Lexington's argument that Dawson's loss of revenue was limited to the statutory guideline of $2^{1}/_{2}$ times the annual revenue, instead of "following the great weight of the evidence" that due to expected growth and other influencing factors in the area of service, Dawson's loss of revenue was really $653,345.

Lexington cross-appeals, claiming that the Board should not have considered factors outside the guidelines established in § 70-1010(2) in determining the total economic impact of the transfer of the service area and that Dawson should accordingly receive $385,949. Lexington asserts that the Board erred in (1) finding that the total economic impact was in excess of the amount provided by the guidelines established by § 70-1010(2), (2) finding that compensation should be provided for "surplus property" lying outside the annexed area, (3) finding that ratchet costs should be allowed as an element of damages in addition to the factor of $2^{1}/_{2}$ times gross revenue, and (4) finding that the net revenue loss, calculated at an arbitrary rate of $2^{1}/_{2}$ times gross revenue, should be allowed as an element of damages.

As noted above, § 70-1010(2) provides generally that a supplier acquiring the rights of another shall purchase the distribution facilities of the supplier located within the area to be acquired, together with the supplier's rights to serve within the area, for a cash consideration to include current reproduction cost less depreciation, the cost to reintegrate the system of the supplier outside the area being transferred, and an amount equal to $2^{1}/_{2}$ times the annual revenue received from power sales to existing customers within the area being transferred.

As a preliminary issue, Lexington maintains that the Board should be bound by these statutory guidelines. Dawson contends, however, that § 70-1010(2) sets forth guidelines only,

and not an exclusive list of the items of valuation.

While a decision of the Board will be affirmed by this court if it is supported by the evidence and is reasonable and not arbitrary, this issue presents a question of statutory interpretation. Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *In re Application of City of Lincoln*, 243 Neb. 458, 500 N.W.2d 183 (1993); *Universal Assurors Life Ins. Co. v. Hohnstein*, 243 Neb. 359, 500 N.W.2d 811 (1993).

In settling upon the meaning of a statute, an appellate court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being the court's duty to discover, if possible, the Legislature's intent from the language of the statute itself. *In re Application of City of Lincoln, supra*; *Hoesly v. State*, 243 Neb. 304, 498 N.W.2d 571 (1993).

In the absence of anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning; when the words of a statute are plain, direct, and unambiguous, no interpretation is necessary or will be indulged to ascertain their meaning. *In re Application of City of Lincoln, supra*; *Hoesly v. State, supra*.

Section 70-1010(2) states that "the board shall determine the total economic impact on the selling supplier and establish the price accordingly based on, *but not limited to*," the guidelines set out in § 70-1010(2)(a), (b), and (c). (Emphasis supplied.) Thus, the plain, direct, and unambiguous language of the statute clearly authorizes the Board to consider factors other than those specifically named. The Board's construction of the statute was proper, and Lexington's argument is without merit.

## TOTAL ECONOMIC IMPACT

The Board found that the total economic impact of transferring the service area from Dawson to Lexington consisted of the following:

| | |
|---|---:|
| Facilities being transferred | $ 92,423 |
| Reintegration costs | 21,873 |
| Surplus property no longer needed | 97,271 |
| Ratchet costs | 113,589 |
| Net revenue loss | 271,653 |
| Total | $ 596,809 |

The parties do not dispute the first two items of the above award. In its first assignment of error, Dawson asserts that the Board erred in accepting Lexington's calculations in regard to ratchet costs, which resulted in a reduction of the ratchet impact portion of the order from $196,679 to $113,589.

General manager Darby testified that Dawson's supplier of electricity required Dawson to pay for 65 percent of its summer peak throughout the winter months, regardless of the amount of electricity actually used. He stated that Dawson has a large number of customers that purchase electricity in the summer to irrigate crops; these irrigators contribute significantly to the summer peak, but do not contribute to meeting the 65-percent requirement during the winter months. The customers Dawson stands to lose in the annexed area are winter-peaking loads, which had been beneficial in offsetting the ratchet costs.

According to a study produced by Darby, without the annexed area to offset the ratchet cost, Dawson would incur additional costs of $13,030 per year. This figure was derived from multiplying the ratchet-free load of 228 kilowatts per month by $11.43, the cost per unit, and then by 5, the average number of months ratchet charges were paid. Costs were calculated through the year 2006, which is when Dawson's current contract with its supplier will be up for renegotiation and is, thus, the first time Dawson would have an opportunity to procure an alternative supply of power. According to the testimony of Macke, the economist retained by Dawson, when adjusted to net present value, the ratchet cost attributable to the loss of this particular area through the year 2006 was estimated to be $196,679.

Lexington argues that the ratchet impact should not be included in the annual income figure of § 70-1010(2)(c) at all. However, Lexington did offer the testimony of Lar Voss, a consulting electrical engineer, to show that the ratchet impact

would be less than that claimed by Dawson. Voss, by applying a smaller annual rate increase, a smaller number of ratchet payments, and a larger discount rate, determined that the ratchet impact would total $113,589 when adjusted for present value.

The Board applied Lexington's figure, which Dawson appeals. Essentially, Dawson argues that its witnesses were more credible than Lexington's. However, the Board's decision in regard to the ratchet impact was supported by evidence in the record and was not arbitrary or unreasonable, and thus, this assignment of error is without merit.

Lexington contends on cross-appeal that the ratchet costs should not have been considered separately, but would have been covered by the figure of $2^1/_2$ times the annual revenue under § 70-1010(2)(c). However, as previously discussed, § 70-1010(2) provides that the determination of the total economic impact of a transfer will be based on, but not limited to, the factors of § 70-1010(a), (b), and (c). Ratchet costs are a real factor in determining the economic impact of the loss of certain customers. The result is to require a higher rate to be paid by the remaining customers. From the face of the statute, it appears that ratchet costs may be considered separately if the Board determines that they constitute costs in excess of those covered by the statutory guidelines, and thus, the ratchet costs were properly considered by the Board.

As its next assignment of error, Dawson contends that in allowing only the statutory minimum of $2^1/_2$ times annual revenue of the annexed area to replace lost revenues to Dawson, the Board disregarded much of the real economic impact which Dawson would suffer. Dawson argues that the annexed area is one with significant growth potential and that in considering only existing customers, the Board ignored the value of such growth.

Dawson offered the testimony of general manager Darby and economist Macke in regard to the growth potential of the annexed area. Darby stated, "In my opinion the annexed area will continue to grow. There is room for considerable development there. There will be spinoff industries from the Iowa Beef operation and also there is potential for other things

such as fast food services, motels, and those types of uses."

Darby testified that he was a member of the Lexington Council on Economic Development and a board member of the Greater Lexington Corporation and that the development potential for the annexed area had been discussed at length in meetings of both of those bodies. However, when further questioned, Darby was unable to name any companies which had expressed an interest in developing the annexed area and was unfamiliar with the area's zoning designations.

In regard to an assessment of the future development potential of the annexed area, Macke stated:

> Lexington, in its interchange on Interstate 80 represents a major service hub, if you will, for traffic on Interstate 80. And there has been considerable growth in the affected area as a result of growth and traffic on Interstate 80. For example, during the 1980s, traffic volume near the Lexington Interchange on Interstate 80 grew by about 4 percent a year. Consequently, we took that potential growth into consideration with the likelihood that there may be additional restaurants, gasoline stations, campgrounds, motels and the like that service traffic on Interstate 80.

Macke also testified that Dawson had considered the likely impact of the soon-to-open Iowa Beef Processing plant, as well as the fact that an industrial park existed within the boundaries of the annexed area. However, when asked on cross-examination to furnish an analysis by company name of customers who would be moving in, Macke responded that "[o]ur analysis is based on past patterns, as I mentioned before . . . . It's impossible for anyone at this point in time to say which restaurant or what truckstop is going to be put in place in 2000."

Dawson cites *Matter of People's Co-Op. Power Ass'n*, 470 N.W.2d 525 (Minn. App. 1991), for the proposition that in a statute similar to the one under consideration here (Minnesota uses the language " 'and other appropriate factors,' " *id.* at 529), it is proper to make an allowance for future earnings from not as yet acquired customers. The theory of the Minnesota court was that such a determination encourages rural cooperatives to make investments necessary to provide power

throughout the service territory, whether that territory is now occupied or not. To the two-judge majority opinion was added a dissent of the third member of the panel, who found the holding of the Minnesota Public Utilities Commission wholly unreasonable and concluded that there being no facilities located in the area to be annexed, the award to the supplier being supplanted should have been zero.

It must be pointed out that the statutory formula in Minnesota contained no factor of $2^1/_2$ times the annual revenue. The Minnesota case is not persuasive.

Considering the speculative nature of the testimony presented by Dawson's experts regarding expansion and future customers in the acquired area, the Board's action in declining to determine loss of revenue based on that testimony was neither unreasonable nor arbitrary and did not constitute error.

Lexington also contests the Board's figure of $271,653 for net revenue lost, arguing that while this figure is $2^1/_2$ times annual revenue, as provided by § 70-1010(2)(c), it should not have been adopted by the Board arbitrarily if the other economic impact factors of the transfer were determined individually. Lexington further argues that the factor contained in subsection (2)(c) was intended by the Legislature to be an arbitrary way of compensating for the economic impact, including surplus property, higher ratchet costs, and net revenue losses. Accordingly, Lexington argues that since the other figures were separately addressed, a more definite determination of Dawson's net revenue loss should be required.

While § 70-1010(2)(c) was apparently intended to compensate a utility for the loss of net revenue it would sustain from having its customers transferred to another utility, it is not clear that it was also intended to encompass all of the peripheral elements of cost making up the total economic impact. In awarding compensation for surplus property and ratchet costs, the Board apparently found that these costs were in excess of the loss of revenue which subsection (2)(c) was specifically intended to address. While Dawson argues that the loss of revenue figure should be adjusted upward, and Lexington argues that it should be reduced, neither party has provided competent evidence to establish that the Board's application of

the $2^1/_2$ times revenue figure was unreasonable or arbitrary.

Finally, on cross-appeal, Lexington asserts that the Board erred in finding that compensation should be provided for surplus property lying outside the annexed area in any event because that cost was subsumed in the $2^1/_2$ times revenue figure. We disagree. The statutory formula relates to loss of revenue due to the loss of customers. The factor of "uselessness" relates to the added cost of service to the remaining customers and refers to the fairness of those rates. However, the Board's figure of $97,271 related to this surplus property, consisting of a transmission line substation and feeder circuits which provided service to the area to be transferred. Testimony by Dawson's general manager indicated that the substation would be rendered partially idle by the loss of the load in the annexed area. Dawson submitted figures, relied upon by the Board, which indicated that $37,466 was the depreciated value of the transmission line and feeder circuits dedicated to the annexed area. Dawson also submitted a figure of $59,805 for 26 percent of the reproduction cost of the substation dedicated to the annexed area. Although the substation was built in the 1950's, this figure did not account for any depreciation. Darby testified that the value of the substation had not depreciated because almost all of the substation had been refurbished, replaced, or redone over a period of time; some of the work was completed as recently as the summer before the hearing. Darby also stated that depreciation was not in order because the figure represented the "fair market value of what's there." On cross-examination, Darby agreed that a smaller transformer, if one was available, could be substituted in this particular substation to accommodate the reduced load and that transformers are frequently changed between substations to rebalance their loads.

Robert Mullendore, an electrical engineering consultant testifying for Lexington, stated that in his opinion, the value of the substation would be less than 30 percent of its reproduction costs. Mullendore based this opinion on an inspection of the substation which indicated to him that the majority of its components were "aged." He believed that while some minor

parts such as "a few insulators, [and] a few disconnect switches" had possibly been replaced, the majority of the substation was of mid-1950's vintage.

In adopting Dawson's submitted figure of $59,805 as the dedicated value of the substation, the Board apparently failed to consider depreciation or the potential adaptation of the substation to a reduced load. The result is inconsistent with the formula contained in § 70-1010(2)(a) for determining the value of acquired facilities and appears to be erroneous.

While the parties contested three of the five findings made by the Board as to the total economic impact of the transfer of the annexed area, of these three, only the Board's assessment for surplus property is unsupported by evidence in the record and is therefore unreasonable and arbitrary.

Accordingly, the Board's decision is affirmed in all respects except that portion relating to the value of the substation and feeder lines located outside the annexed area. As to that portion of the decision, it is reversed and the cause remanded with directions to the Board to calculate the depreciated value of the substation based on the 3-percent-per-year statutory formula and to determine what share, if any, of that depreciated value is represented by equipment which has actually been rendered useless by the transfer.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED WITH DIRECTIONS.

SHANAHAN, J., not participating in the decision.