IN RE APPLICATION OF CITY OF NORTH PLATTE, NEBRASKA.
DAWSON COUNTY PUBLIC POWER DISTRICT, APPELLANT, V.
CITY OF NORTH PLATTE, NEBRASKA, APPELLEE.

599 N.W. 2d 218

Filed August 27, 1999.    No. S-97-784.

E. Bruce Smith, of Stewart & Smith, for appellant.

Douglas L. Stack, of Girard and Stack, P.C., for appellee.

Patrick W. Healey for amicus curiae Nebraska Rural Electric Association.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## INTRODUCTION

The City of North Platte (North Platte) filed an application with the Nebraska Power Review Board (PRB) to determine how much North Platte must compensate the Dawson County Public Power District (power district) for annexing land in the power district's service area and supplying electricity to customers there. The PRB determined that North Platte did not have to compensate the power district under Neb. Rev. Stat. § 70-1010 (Reissue 1996) for revenue that might have been generated by a potential electric customer in the power district's service area who had not yet begun purchasing electricity at the time of annexation. The power district appeals. For reasons that follow, we affirm the order of the PRB.

## FACTUAL BACKGROUND

The pertinent facts are undisputed and have been agreed upon by the parties. Around the early part of May 1996, North Platte learned that a Utah partnership doing business as Flying J., Inc. (Flying J), was planning to purchase a tract of land just outside the city limits to build a truckstop and restaurant facility. The tract was within the power district's service area. North Platte believed that Flying J would begin construction on the tract in the fall of 1996 and that the restaurant and truckstop would be completed by late fall of 1997. Based on that knowledge, North Platte decided that it wanted to be the supplier of electricity to the facilities on the tract. North Platte entered into negotiations with the power district to facilitate such. Up to that time, the Nebraska Department of Roads was the only customer of electricity in the area where the tract is located. By an ordinance dated August 20, 1996, North Platte annexed the tract.

Nevertheless, the power district entered into a contract with Flying J on October 24, 1996. The contract did not require that Flying J actually purchase electricity, only that Flying J would purchase electricity from the power district at specified rates if Flying J came to have need for electricity on the tract. The contract stated that it would remain in effect for 5 years after the initial billing period for electricity used by Flying J.

Meanwhile, North Platte continued to encourage Flying J to build the facilities on the tract, offering various forms of concessions and assistance. For example, in February 1997, North Platte promised Flying J that North Platte would be at least partly responsible for bringing the tract into compliance with federal wetlands laws and would grant various water and sewer subsidies if Flying J built the facilities there. In return, Flying J promised that construction of the facilities on the tract would be completed by February 1999. Flying J became the owner of the tract on February 25, 1997.

North Platte and the power district continued to negotiate the terms of retiring the power district as the supplier of electricity to the tract and establishing North Platte as such. North Platte and the power district were able to agree on all terms but one, that being whether § 70-1010 requires North Platte to compensate the power district for the potential revenue that would have

been generated annually on the tract by the Flying J facilities. By stipulation, North Platte and the power district agreed that Flying J's facilities on the tract would have annual electric requirements similar to another Flying J facility near Gretna, Nebraska; specifically, such requirements would amount to $75,746.54 in annual revenue to the supplier of electricity.

The power district maintained that North Platte should compensate the power district for 2½ times that amount ($189,366, rounded down) pursuant to § 70-1010(2)(c), claiming that the Flying J facility should be treated as an existing customer. The power district also asserted that North Platte should be liable to the power district for the potential Flying J revenue regardless of whether Flying J is an existing customer under the statute, reasoning that the factors set forth in § 70-1010(2) are merely guidelines and not the exclusive criteria for deciding the appropriate amount of compensation.

On December 13, 1996, North Platte filed an application with the PRB for authority to serve the newly annexed area and to transfer facilities and customers. By the time the PRB held a hearing on May 9, 1997, Flying J had not yet purchased electricity from either supplier. After the hearing, the PRB determined that North Platte did not have to compensate the power district for the potential revenue generated by Flying J. The PRB reasoned that ordering such compensation would be too speculative because Flying J had not begun purchasing power at the time of annexation. As a result, the PRB ordered only that North Platte pay to the power district the sum of $11,959 for the reproduction cost of the facilities being acquired by North Platte from the power district and the sum of $7,260.12 for the taking of the power district's only customer located in the annexed area, i.e., the Nebraska Department of Roads.

## ASSIGNMENT OF ERROR

The power district assigns, restated, that the PRB erred in finding that the total economic impact on the power district from transferring electric customers on the tract to North Platte's service area did not include the loss of revenue that would potentially be generated by Flying J, an identified future customer.

## STANDARD OF REVIEW

A decision of the PRB will be affirmed if it is supported by the evidence and is not arbitrary, capricious, unreasonable, or otherwise illegal. *In re Application of City of Lexington*, 244 Neb. 62, 504 N.W.2d 532 (1993). The meaning of a statute is a question of law, and a reviewing court is obligated to reach conclusions independent of the determination made below. *Id.*

## ANALYSIS

Section 70-1010 requires the PRB to determine the compensation due a supplier of electricity as a consequence of a transfer of service area. We are once again called upon to interpret § 70-1010, which reads in pertinent part:

> (1) The [B]oard shall have authority upon application by a supplier at any time to modify service areas or customers to be served as previously established. . . .
>
> (2) In the event of a proposed transfer of customers and facilities from one supplier to another . . . the parties shall attempt to agree upon the value of the certified service area and distribution facilities and customers being transferred. If the parties cannot agree upon the value, then the [B]oard shall determine the total economic impact on the selling supplier and establish the price accordingly *based on, but not limited to*, the following guidelines: The supplier acquiring the certified service area, distribution facilities, and customers shall purchase the electric distribution facilities of the supplier located within the affected area, together with the supplier's rights to serve within such area, for cash consideration which shall consist of . . . (c) *an amount equal to two and one-half times the annual revenue received from power sales to existing customers of electric power within the area being transferred . . . .*

(Emphasis supplied.)

This court interpreted § 70-1010 in *In re Application of City of Lexington, supra*, when the city and the power district unsuccessfully attempted to agree upon the value of the annexed certified service area, distribution facilities, and customers of the power district being transferred to the city. The primary difference between that case and the cause presently before us is that

the power district could not identify potential future electric customers in the service area annexed by the city, whereas the power district had identified Flying J as a prospective customer in the instant case. In *In re Application of City of Lexington, supra,* we explained that the PRB may consider factors other than those specifically listed in § 70-1010 when determining the total economic impact on the power district.

Nevertheless, we held that the PRB was correct in declining to consider the value of expansion and future customers in the area annexed by the city of Lexington. *In re Application of City of Lexington, supra.* We reasoned that such considerations were too speculative given the testimony in that case, which did not specifically identify future customers. *Id.* The power district contends that by specifically identifying Flying J as a future customer prior to the date of annexation, such a consideration is not too speculative in the instant case. We do not agree.

First, the PRB was correct in declining to treat Flying J as an existing customer under § 70-1010(2)(c). In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Central States Found. v. Balka,* 256 Neb. 369, 590 N.W.2d 832 (1999). The plain meaning of existing customer under § 70-1010(2)(c) is a customer who is purchasing or has been purchasing electricity from a supplier of electricity at the time transfer of the service area becomes imminent. While the power district and Flying J negotiated a contract for the potential purchase of electricity, the record reveals that no such purchase ever occurred. As such, Flying J was not an existing customer of the power district at any point.

Of course, the power district is correct in pointing out that the PRB may consider factors other than those listed in § 70-1010(2) in determining the total economic impact on the district. *In re Application of City of Lexington,* 244 Neb. 62, 504 N.W.2d 532 (1993). The question, then, is whether § 70-1010 requires the PRB to consider the revenue potentially generated by Flying J in calculating the amount of compensation North Platte must pay to the power district.

Where statutory construction is called for, a court looks to the statute's purpose and then construes the statute in a reasonable manner that will best achieve that purpose, rather than interpreting the statute in a way that would defeat its purpose. *In re Invol. Dissolution of Battle Creek State Bank*, 254 Neb. 120, 575 N.W.2d 356 (1998). To determine the purpose of the statute, a court may consider the components of a series or collection of statutes pertaining to a certain subject. *Id.* Looking to other components of Neb. Rev. Stat. § 70-1001 et seq. (Reissue 1996), it becomes clear that the policy behind the statutes is to provide Nebraskans with adequate electric service at the lowest cost possible, to eliminate conflict and competition between power suppliers, and to avoid duplicative facilities and resources.

When North Platte annexed the tract in August 1996, North Platte was not obligated to supply electricity to the area. North Platte could have begun negotiations with the power district after annexation and then decided not to supply electricity to the tract if it became apparent that Flying J was not coming or for other economic reasons. By the same token, North Platte could have acquired the service area via a PRB determination before Flying J committed to building the facilities, only to have Flying J decline the entire venture. Under either scenario, the power district would not be entitled to the compensation it now seeks. Therefore, the PRB did not act arbitrarily or capriciously when it did not consider other factors in assessing the total economic impact on the power district where those factors addressed potential economic benefits that the power district had not yet, and may never have, realized.

However, the date of annexation, as determined by the PRB, is not the key date to determine valuation for purposes of § 70-1010(2). The proper date to determine valuation of the total economic impact on the power district pursuant to § 70-1010 is when North Platte firmly asserted its right to acquire the service area by filing an application with the PRB to serve the newly annexed area. The circumstances of the instant case illustrate why the filing of an application with the PRB to serve the area triggers the date of valuation. At the date of annexation, North Platte was not obligated to become the power supplier for the annexed area, see § 70-1008(2), and North Platte did not com-

mit to acquiring the service area until it filed its application with the PRB. Thus, the date of annexation is not the accurate cutoff date. By the same token, Flying J had not actually solidified its plan to purchase the tract and build the facilities until the end of February 1997, almost 3 months after North Platte filed its application with the PRB. For various reasons, Flying J could have declined to purchase the tract after North Platte filed its application with the PRB. It thus becomes obvious that at the time of North Platte's filing of an application with the PRB on December 13, 1996, Flying J was not an existing customer of the power district as set forth in § 70-1010(2)(c), but, rather, a prospective customer.

The determination of the PRB that the Nebraska Department of Roads was the only existing customer in the area being annexed, pursuant to § 70-1010(2)(c), is supported by the evidence and is not arbitrary, capricious, unreasonable, or otherwise illegal. Even though the PRB utilized the date of annexation, rather than the date of North Platte's PRB application, in its determination that compensation to the power district for prospective customer Flying J is too speculative, the reasoning employed by the PRB leads to the same result under the circumstances of the instant case.

## CONCLUSION

Accordingly, the order of the PRB is affirmed.

AFFIRMED.