IN RE APPLICATION OF CITY OF LINCOLN, NEBRASKA.
CITY OF LINCOLN, NEBRASKA, DOING BUSINESS AS LINCOLN
ELECTRIC SYSTEM, APPELLANT, V. NORRIS PUBLIC POWER
DISTRICT, APPELLEE.

500 N.W.2d 183

Filed May 21, 1993.    No. S-91-430.

Charles D. Humble and Linda W. Rohman, of Erickson & Sederstrom, P.C., for appellant.

Steven G. Seglin, of Crosby, Guenzel, Davis, Kessner & Kuester, for appellee.

Patrick W. Healey, of Healey Wieland Law Firm, for amicus curiae Nebraska Rural Electric Association.

Glenda J. Lanik for amici curiae League of Nebraska Municipalities and Nebraska Municipal Power Pool.

Patrick W. Healey, of Healey Wieland Law Firm, for amicus curiae Cornhusker Public Power District.

Kenneth M. Olds, of Olds and Pieper, for amicus curiae Nebraska Electric Generation and Transmission Cooperative, Inc.

HASTINGS, C.J., BOSLAUGH, CAPORALE, SHANAHAN, and FAHRNBRUCH, JJ., and GRANT, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

The applicant-appellant, City of Lincoln (doing business as Lincoln Electric System), sought from the Nebraska Power Review Board a modification of the city's electrical service area so as to permit the city to supply electrical services in an area now served by the protestant-appellee, Norris Public Power District. Prior to hearing, Norris unsuccessfully moved to dismiss the application on the ground that the city had not pled facts entitling it to the relief it sought. The matter then proceeded to hearing. At the close of the city's evidence, Norris successfully moved for dismissal on the ground that the city had failed to establish facts entitling it to a modification. The dispositive assignments of error asserted by the city may be summarized as claiming that the board (1) misinterpreted the applicable statutes and (2) failed to apply the law of the case. We affirm.

## II. CONTENTIONS OF PARTIES

In general, the city alleges that as the result of an annexation, it acquired planning and zoning jurisdiction beyond its corporate limits and into the subject area, where Norris presently supplies electrical services. Claiming that it must plan for and be prepared to meet the increased demand for electrical services created by the continuing urbanization of areas within its planning and zoning jurisdiction, the city asserts that its

service area must be modified under the provisions of Neb. Rev. Stat. § 70-1007 (Reissue 1990).

Norris' position is that not only did the city fail to allege facts entitling it to a modification of its service area, it failed to prove facts entitling it to such.

### III. THE RECORD

The record establishes the city's planning and zoning jurisdiction over the subject area, which consists of approximately 6 square miles falling within Norris' service area and contains 28 consumers of Norris' electrical services.

The record further demonstrates that the city has acquired other areas previously served by Norris and integrated them into the city's system; however, considerable effort, and apparently expense, was required to conform Norris' installations to the city's standards.

For example, the city uses a three-phase circuit with cable rated at 15,000 volts capable of carrying 580 to 590 amperes. In contrast, Norris uses smaller cable capable of carrying only 200 amperes. The city typically needs between 3 to 5 years of leadtime in order to design and construct the urban electrical delivery system it uses. Optimally, the city locates its substations on 2- to $2^{1}/_{4}$-mile centers, looped so that the various substations back each other up in the event of breakdowns, thus avoiding losses of electrical services to its consumers. When an area has already been developed, the process of obtaining the needed rights-of-way to construct substations becomes difficult and expensive. Moreover, placing larger equipment into an existing neighborhood is disruptive. Therefore, the city prefers to begin serving an area prior to active development.

Although the contestants have been able to agree on day-to-day operational matters, Norris has refused to transfer any territory or customers to the city. It has even refused to engage in any planning with regard to future transfers until annexation has actually taken place. In the city's view, waiting until annexation or just before to engage in joint planning is too late—"the interface between an urban system and a rural system occurs better in an area of lower density than higher density." The city would like to establish a "set of mutually

agreeable items that would indicate how the parties would plan a transition from one utility to another as the area grows."

The city also adduced evidence that it has grown both in area and population and will continue to do so into the foreseeable future and that the subject area will be developed and be annexed at some unspecified future time. In comparison to peer utilities, the city "perform[s] very well" in terms of outages and does so at competitive rates. Indeed, if the city had been serving the subject area in 1989, the 28 consumers involved would have paid almost 19 percent less for their electricity. However, the city will need to acquire increased electrical capacity, and as a consequence, its average rate is more likely to increase than to decrease.

There is no evidence that Norris is unable to service the consumers in the subject area or that such service involves a wasteful and unwarranted duplication of facilities.

## IV. ANALYSIS

With the foregoing background, we proceed to a consideration of each of the city's two dispositive and summarized assignments of error.

### 1. INTERPRETATION OF STATUTES

The first of these assignments of error claims that the board misinterpreted the applicable statutes. In addition to § 70-1007, mentioned in part II above, the statutes which control the resolution of the substantive issues in this case are found at Neb. Rev. Stat. §§ 70-1005, 70-1008, 70-1010(1), and 70-1011 (Reissue 1990).

Section 70-1005 provides:

Any supplier may at any time on or after July 1, 1964, apply to the board to establish its service area. In such case and in all cases where agreements have not been entered into, including cases arising under section 70-1008, the secretary shall give written notice to the parties involved citing them to appear at a time, not less than thirty days thereafter, and at a place specified in the notice for a hearing upon the matter of establishing the service areas concerned in the notice. The provisions of this section shall not apply to service within the corporate limits of any

municipality.

Section 70-1007 reads:

> After the hearing, the board shall make an order establishing the service areas in the matter covered by the notice. In determining any such matter, the board shall seek to carry out the policy stated in section 70-1001. It shall give such consideration as is appropriate in each case to the following:
>
> (1) The supplier best able to supply the load required;
>
> (2) The most logical future supplier of the area;
>
> (3) The desires of the supplier with respect to loads and service areas it wishes to serve;
>
> (4) The ability to provide service at costs comparable to other suppliers in the service area and the immediate costs to the ultimate consumers involved in the transfer; and
>
> (5) The ability of the supplier to cope with the problems of expanding loads and increased costs.

Neb. Rev. Stat. § 70-1001 (Reissue 1990) declares that in order to make adequate electric service available at as low an overall cost as possible, it is the policy of the State to avoid and eliminate conflict and competition among the various entities furnishing electric energy, to avoid and eliminate the duplication of facilities and resources, and to facilitate the settlement of rate disputes.

Section 70-1008 proclaims:

> In the absence of an agreement between the suppliers affected and notwithstanding the provisions of subdivisions (1) to (5) of section 70-1007:
>
> (1) Existing service areas presently designated by agreements and exhibits filed with and approved by the board, or previously ordered by the board, shall remain and be established as certified service areas.
>
> (2) A municipally owned electric system, serving such municipality at retail, shall have the right, upon application to and approval by the board, to serve newly annexed areas of such municipality. Electric distribution facilities and customers of another supplier in such newly acquired certified service area may be acquired, in accordance with the procedure and criteria set forth in

section 70-1010 . . . .

(3) All retail power suppliers having adjoining certified service areas shall engage in joint planning with respect to customers, facilities, and services, taking into account the considerations specified in section 70-1007, including the possibility that an area may be annexed by a municipality within a reasonable period of time.

Section 70-1010(1) specifies, in relevant part:

The board shall have authority upon application by a supplier at any time to modify service areas or customers to be served as previously established. The same procedures as to notice, hearing, and decision shall be followed as in the case of an original application. Suppliers shall have authority by agreement to change service areas or customers to be served with the approval of the board.

The pertinent portion of § 70-1011 recites:

Except by agreement of the suppliers involved, no supplier shall offer electric service to additional ultimate users outside its service area or construct or acquire a new electric line or extend an existing line into the service area of another supplier for the purpose of furnishing service to ultimate users therein without first applying to the board and receiving approval thereof, after due notice and hearing under rules and regulations of the board. Such approval shall be granted only if the board finds that the customer or customers proposed to be served cannot or will not be furnished adequate electric service by the supplier in whose service area the customer is located, or that the provision thereof by such supplier would involve wasteful and unwarranted duplication of facilities.

### (a) Scope of Review

Stripped to its essence, the city's position is that § 70-1010(1) requires that its application be judged under the standards set forth in § 70-1007. The gravamen of Norris' position, on the other hand, is that the board may modify an existing service area only when the conditions set forth in § 70-1011 are met.

We are thus confronted with a matter of statutory

interpretation, a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *Universal Assurors Life Ins. Co. v. Hohnstein, ante* p. 359, 500 N.W.2d 811 (1993); *Hoesly v. State, ante* p. 304, 498 N.W.2d 571 (1993); *Professional Firefighters of Omaha v. City of Omaha, ante* p. 166, 498 N.W.2d 325 (1993). Moreover, in settling upon the meaning of a statute, we must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being our duty to discover, if possible, the Legislature's intent from the language of the statute itself. *Hoesly, supra.* See, *Fecht v. The Bunnell Co., ante* p. 1, 497 N.W.2d 50 (1993); *Curry v. State ex rel. Stenberg*, 242 Neb. 695, 496 N.W.2d 512 (1993); *In re Interest of Powers*, 242 Neb. 19, 493 N.W.2d 166 (1992). In the absence of anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning; when the words of a statute are plain, direct, and unambiguous, no interpretation is necessary or will be indulged to ascertain their meaning. *Hoesly, supra; Fecht, supra; Curry, supra.* Further, the components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *Fecht, supra; Smith v. Smith*, 242 Neb. 812, 497 N.W.2d 44 (1993); *In re Interest of M.J.B.*, 242 Neb. 671, 496 N.W.2d 495 (1993). Finally, if there is a conflict, the special provisions of a statute prevail over the general provisions in the same or other statutes. *Hoesly, supra.* See, also, *Sports Courts of Omaha v. Meginnis*, 242 Neb. 768, 497 N.W.2d 38 (1993); *Maack v. School Dist. of Lincoln*, 241 Neb. 847, 491 N.W.2d 341 (1992).

### (b) Statutory Interplay

The city's argument begins with our declaration in *Cornhusker P. P. Dist. v. Loup River P. P. Dist.*, 184 Neb. 789, 798, 172 N.W.2d 235, 240 (1969), that "[a]rea service contracts must be respected in the furtherance of the intent of the statute

unless and until the supplier is unable to provide the service in accordance with the guidelines set out in section 70-1007 . . . ." Pointing out that § 70-1010(1) subjects an application to modify a service area to the "same procedures as to notice, hearing, and decision . . . as in the case of an original application," the city concludes that the elements of § 70-1007 are as controlling in an application to modify an existing service area as they are in an application for the initial establishment of a service area under the provisions of § 70-1005.

It is true that in *Cornhusker P. P. Dist.*, we relied upon the factors enumerated in § 70-1007 to determine whether the supplier in that case was unable to provide the service. However, in *Cornhusker P. P. Dist.*, we did not, as the city infers, hold that § 70-1007 is to be applied in modification cases on a "best provider wins" basis.

Moreover, the city's argument overlooks the effect of 1979 Neb. Laws, L.B. 223. Prior to the enactment of L.B. 223, § 70-1008 (Reissue 1976) provided:

> In the absence of an agreement between the suppliers affected and notwithstanding the provisions of subdivisions (1) to (5) of section 70-1007:
>
> (1) In the zoning area surrounding any municipality and outside the corporate limits thereof, if such municipality operates a retail system, it shall have the right to serve such zoning area at retail except as to such customers as are presently served by other suppliers. Such a municipality may acquire the facilities of other suppliers in such zoning area by negotiation.
>
> (2) In determining the service area of a municipally-owned electric system, there shall be included, as a maximum, the corporate area of the municipality, the zoning area outside the corporate limits of such municipality, and the area beyond the zoning area which is presently being served by such municipality, including not more than the area one half mile on each side of the line presently used by such municipality to serve its existing customers, except for customers presently served by other suppliers. When any new customer outside the corporate limits of any municipality and outside the

zoning limits surrounding such municipality locates closer to electric lines owned by other suppliers in the municipal service area as provided for in this section, in case of disagreement, the question of which supplier shall serve such new customer shall be submitted to the Nebraska Power Review Board for determination under the standards set forth in section 70-1007.

Thus, L.B. 223 removed the zoning area preference previously afforded to municipalities by § 70-1008; the present language of § 70-1008 makes annexation the event which triggers a municipality's right to serve the new area. This more specific language controls over the general language of §§ 70-1007 and 70-1010(1) and thus limits the board's power to amend certified service areas to the grounds specified in § 70-1011.

It is true that subdivision (3) of § 70-1008 (Reissue 1990) provides for joint planning between "[a]ll retail power suppliers having adjoining certified service areas" utilizing "the considerations specified in section 70-1007." Upon a first reading, this provision appears inconsistent with the earlier language of § 70-1008 that in the absence of an agreement and notwithstanding the provisions of § 70-1007, existing service areas shall remain as certified service areas. It is logically impossible to consider and at the same time not consider the § 70-1007 factors. However, although not artfully drawn, the proviso requiring consideration of the § 70-1007 factors in joint planning harmonizes with the "notwithstanding" language by recognizing that the planning provision is nothing more than a nonbinding tool to be used under appropriate circumstances.

As a consequence, absent the concurrence of the suppliers, the only present means of obtaining a modification of a service area is by meeting the requirements set forth in § 70-1011, that is, by establishing that the present supplier cannot or will not furnish adequate electrical service or that its doing so involves a wasteful and unwarranted duplication of facilities.

### 2. LAW OF CASE

However, the city urges in the second and last of its dispositive and summarized assignments of error that by

overruling Norris' prehearing motion to dismiss, the board
determined that the city had alleged a basis for obtaining a
modification of the service area under the factors set forth in
§ 70-1007; that the city accordingly structured the presentation
of its evidence in reliance upon that ruling; and that the board
was thus precluded from later ruling that the § 70-1007 factors
did not apply.

It should first be noted that in the context of court trials, we
have held that a pretrial motion to dismiss another's action is
not a permissible pleading, but that under certain
circumstances, and where by stipulation of the parties or court
rule it is allowed, such a motion may be treated as a demurrer.
*United States Fire Ins. Co. v. Affiliated FM Ins. Co.*, 225 Neb.
218, 403 N.W.2d 383 (1987). See, also, *Cool v. Sahling Trucks,
Inc.*, 237 Neb. 312, 466 N.W.2d 71 (1991). While there may be
practical difficulties which prevent the strict and literal
application of certain court trial rules to proceedings such as are
involved here, see, e.g., *Basin Elec. Power Co-op v. Little Blue
N.R.D.*, 219 Neb. 372, 363 N.W.2d 500 (1985), and *County of
Blaine v. State Board of Equalization & Assessment*, 180 Neb.
471, 143 N.W.2d 880 (1966), because the outcome is not
affected, we need not at this time determine whether Norris'
prehearing motion was a permissible pleading in this
proceeding.

The city's preclusion argument is predicated on a doctrine
which is closely allied to res judicata and collateral estoppel and
is known as the law of the case doctrine.

> Unlike [res judicata and collateral estoppel], which
> involve successive suits, [the law of the case doctrine]
> involves successive stages of the same suit. The same
> policy of repose, however, underlies all. An issue which
> has been litigated and decided in one stage of a case should
> not be relitigated in a later stage. The most usual situation
> for the application of the doctrine involves a second or
> third appeal in the same case. For instance, an appellate
> court may reverse and remand a case for a new trial
> because of alleged errors of law committed by the trial
> court. After a second trial there may be a second appeal in
> which the appellant wishes to reargue the points decided

on the former appeal. . . .

The [law of the case] doctrine operates . . . to preclude a reconsideration of substantially similar, if not identical, issues. It is not applied with the same rigor as res judicata or collateral estoppel. It does not include all questions which were present in the case and which might have been decided, but were not, and it will not be applied if considerations of substantial justice suggest a reexamination of the issue is warranted.

Milton D. Green, Basic Civil Procedure 239-41 (2d ed. 1979). See, *Pegues v. Morehouse Parish School Bd.*, 706 F.2d 735 (5th Cir. 1983); *Lehrman v. Gulf Oil Corporation*, 500 F.2d 659 (5th Cir. 1974); *Consumers Union of United States, Inc. v. Veterans Admin.*, 436 F.2d 1363 (2d Cir. 1971).

This analysis is consistent with *Kleckner v. Turk*, 45 Neb. 176, 63 N.W. 469 (1895), in which this court determined that a prior refusal to dismiss an action did not preclude the entry of a directed verdict in favor of the defendants. In so ruling, the *Kleckner* court noted that the later ruling involved a consideration of the evidence which had been adduced, a consideration not available at the time of the earlier ruling.

The same situation exists here. At the time of the prehearing motion, the board had before it only the city's allegations; it could not then know whether the evidence would establish either that Norris failed to meet its service obligations or that doing so did not involve a wasteful and unwarranted duplication of facilities. However, at the close of the city's evidence, the board knew that the city had failed to prove the existence of the requirements for obtaining a modification of its service area. Thus, the posthearing motion did not present an identical or substantially similar issue as did the prehearing motion. Therefore, the prehearing ruling did not preclude the posthearing ruling.

## V. JUDGMENT

As the record fails to establish either of the city's dispositive and summarized assignments of error, the decision of the board is hereby affirmed.

AFFIRMED.

WHITE and LANPHIER, JJ., not participating.