METROPOLITAN LIFE INSURANCE COMPANY, A NEW YORK CORPORATION, APPELLEE, V. KISSINGER FARMS, INC., A NEBRASKA CORPORATION, ET AL., APPELLEES, AND DEWITT FARMS, INC., A NEBRASKA CORPORATION, APPELLANT.

508 N.W.2d 568

Filed December 3, 1993.   No. S-90-521.

Stephen H. Nelsen and Richard P. Garden, Jr., of Cline, Williams, Wright, Johnson & Oldfather, for appellant.

Arend R. Baack, of Luebs, Beltzer, Leininger, Smith & Busick, for appellee Metropolitan Life Insurance Co.

BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and RONIN, D.J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

In order to secure a promissory note drawn by the defendants-appellees Kissinger Farms, Inc., Kissinger Feed Lots, Inc., and Ralph Kissinger, Jr., the two corporations executed a mortgage in favor of the plaintiff-appellee, Metropolitan Life Insurance Company, thereby encumbering the separate land owned by each of the aforenamed corporations. Following the borrowers' default on the underlying loan, Metropolitan instituted this foreclosure action, and the district court enforced the mortgage. The defendant-appellant DeWitt Farms, Inc., the successor owner of a portion of the land mortgaged by Kissinger Farms, asserts that the district court erred in decreeing foreclosure of the mortgage, claiming, in summary, that Kissinger Farms did not effectively authorize execution of the mortgage and that the mortgage is not enforceable on any other basis. We affirm.

## II. SCOPE OF REVIEW

A proceeding to foreclose a real estate mortgage is an equitable action. *McCook Nat. Bank v. Myers*, 243 Neb. 853, 503 N.W.2d 200 (1993). While in such an action an appellate

court tries the factual issues de novo on the record and reaches a conclusion independent of the findings of the trial court, this case is controlled by statute. Statutory interpretation is a matter of law in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *AMISUB v. Board of Cty. Comrs. of Douglas Cty., post* p. 657, 508 N.W.2d 827 (1993); *In re Application of City of Lincoln,* 243 Neb. 458, 500 N.W.2d 183 (1993). See, also, *Wilson v. Misko, ante* p. 526, 508 N.W.2d 238 (1993).

### III. FACTS

Prior to the creation of Kissinger Farms, Ralph Kissinger, Jr., and his father had farmed together. In 1967, the aforementioned son and his wife incorporated Kissinger Feed Lots, and the son at all relevant times remained a shareholder of that corporation. After its incorporation, Kissinger Feed Lots rented land from Ralph Kissinger, Jr.'s father and mother.

The father and mother incorporated Kissinger Farms in March 1968 and later began making gifts of the corporate stock to their two children, the said son and their daughter, Miriam DeWitt. Upon the mother's death in 1977, the shares of stock remaining in her name were held for the benefit of the father and two children in a trust, for which the son served as sole trustee. All of the shares of stock apparently passed to the two children upon the father's death in 1981.

For many years, the board of directors of Kissinger Farms included the father, mother, and son. Jack DeWitt, the daughter's child, became a member of the board in 1975. However, the board held no annual or special meetings; rather, its standard practice was to affirm and ratify the actions taken by the corporation's officers and directors by documents designated as "actions in writing." The corporation also used such documents rather than holding regular meetings of its shareholders.

At times, Kissinger Feed Lots and Kissinger Farms transferred funds from one to the other. On one occasion, when Kissinger Farms needed money to pay salaries to the father, mother, and daughter, Kissinger Feed Lots funds were

transferred to Kissinger Farms. At other times, when Kissinger Feed Lots loans from Fairfield State Bank were at the lending limit, funds were borrowed from the bank in the name of Kissinger Farms for the use of Kissinger Feed Lots.

As a shareholder of Kissinger Farms, the daughter knew of its lack of compliance with corporate formalities and, until her father's death, never sought to influence its operations, permitting the father and son to conduct business as they saw fit.

In 1968, Kissinger Feed Lots leased all of the 1,123 acres of land owned by Kissinger Farms. Later, Kissinger Feed Lots began to experience financial difficulties. Its short-term debt had increased and exceeded the corporation's current assets. Fairfield State Bank loaned Kissinger Feed Lots operating funds up to the bank's lending limit, and additional funds were lent by the Production Credit Association (PCA).

As reflected by an action in writing dated June 27, 1977, all the directors of Kissinger Farms consented to a resolution authorizing the corporate president or treasurer to "sign a continuing guarantee to the [PCA] for the payment at maturity of any or all indebtedness . . . of Kissinger Feed Lots Inc. . . . in connection with the loan or loans hereafter to be made."

At some point the PCA notified Kissinger Feed Lots that it would no longer continue financing the operation because of the excessive amount of short-term debt. Kissinger Feed Lots was thus faced with liquidating its operation to satisfy the debt or finding suitable long-term financing.

On May 30, 1978, Kissinger Feed Lots and Kissinger Farms executed a promissory note payable to the U.S. Small Business Administration (SBA) for $163,600, secured by a mortgage on approximately 351 acres of land owned by Kissinger Farms. Kissinger Farms held no formal meeting to approve this loan, but a directors' action in writing dated May 30, 1978, executed by the father and son as directors authorizes the loan and recites that it was to be made by Kissinger Feed Lots, which was to be responsible for repayment of the loan. Jack DeWitt did not sign this document.

Nonetheless, the father as president and the son as

secretary-treasurer executed an SBA directors' resolution form, authorizing the loan on behalf of Kissinger Farms. According to the son, $25,000 of the SBA loan funds were utilized by Kissinger Farms; the balance of the loan proceeds were used by Kissinger Feed Lots. The daughter did not recall signing a shareholder consent for this loan, but does remember acting as a guarantor to the extent of $15,000.

In January 1978, the son traveled to California and told the daughter that he would probably have to mortgage the real estate of both Kissinger Feed Lots and Kissinger Farms. The daughter vehemently objected to mortgaging Kissinger Farms' land, which was then unencumbered. Nonetheless, in May 1978, the son applied for a $1,100,000 loan from Metropolitan to refinance Kissinger Feed Lots' short-term debt, utilizing as mortgage security all of the land owned by Kissinger Feed Lots and Kissinger Farms.

The father and son, as directors of Kissinger Farms, executed an action in writing dated June 24, 1978, reading, in relevant part:

> The undersigned, constituting all the Directors of the Corporation entitled to vote at the annual meeting, have waived notice of said meeting, have dispensed with holding of said meeting, and have . . . taken the following action by this writing:
>
> . . . .
>
> 3. Authorize and approve the proposed action of the President [the father] to grant a security interest in the property of Kissinger Farms, Inc. to [Metropolitan] as collateral for a mortgage loan by that company to Kissinger Feed Lots Inc., for the sum of [$1,100,000]. All costs, fees, interest and repayments on said loan are to be borne by Kissinger Feed Lots, Inc.

Jack DeWitt, the other Kissinger Farms director, did not execute that document; however, he later executed an action in writing of the board of directors of Kissinger Farms dated September 15, 1978, by which the board at a special meeting decided to: "1. Ratify and approve the action in writing of the annual meeting of the Board of Directors on 2[unreadable] June, 1978."

In the meantime, Metropolitan had, on August 31, 1978, made its loan. The promissory note was executed by the son as president and attested to by his daughter-in-law as secretary on behalf of Kissinger Feed Lots and executed by the father as president and attested to by the son as secretary on behalf of Kissinger Farms. The son also signed the note in his individual capacity. Having no interest in the land, the son did not execute the mortgage securing the note in his individual capacity, but the same officers signed it and the related financing statement on behalf of Kissinger Feed Lots and Kissinger Farms.

Prior to execution of the loan documents, Metropolitan had been provided with a "Corporate Stock Certification" signed by the son as secretary-treasurer representing that there were 1,900 total outstanding shares of Kissinger Farms stock. Metropolitan was also provided with a document executed by the father and the son in his individual and trust capacities and again in his capacity as secretary of Kissinger Farms that more than two-thirds of the shareholders consented to the transaction. The record shows that 1,315 shares consented to the transaction; the father owned 360 of those shares and the son owned or controlled the remaining 955 shares.

The loan funds were disbursed to Kissinger Feed Lots and its creditors pursuant to an authorization to disburse dated July 26, 1978, signed by the father on behalf of Kissinger Farms and the son on behalf of Kissinger Feed Lots.

The daughter claims that she did not learn of the mortgage to Metropolitan until the son called and told her after the loan had been completed. The son confirms that he did not specifically mention a mortgage with Metropolitan when he visited the daughter in California, but claims that he did so prior to completing the loan.

After the father's death, the relationship between the son and daughter deteriorated, and in November 1983, the son proposed a division of the land held by Kissinger Farms. As a consequence, in order to divide the assets between the two, approximately 440 acres of land were deeded in 1984 from Kissinger Farms to DeWitt Farms, which was incorporated by the daughter. DeWitt Farms then leased its land to Kissinger Feed Lots on a share lease continuing through the time of trial.

## IV. ANALYSIS

Because the record establishes that Kissinger Farms properly authorized execution of the Metropolitan mortgage, we do not reach the issue of whether the mortgage would have been enforceable on any other ground.

DeWitt Farms' assertion that execution of the mortgage was ineffective rests on the claims that, given the son's conflicting financial interest, (1) the requisite shareholder approval was lacking and (2) the board of directors' authorization of the transaction was inoperative.

### 1. SHAREHOLDER APPROVAL

The method through which a corporation may authorize the execution of a mortgage encumbering all or substantially all of its property and assets is set forth in Neb. Rev. Stat. § 21-2077 (Reissue 1991), which provides, in relevant part:

> The sale, lease, exchange, or other disposition of all, or substantially all, the property and assets of a corporation, in the usual and regular course of its business, and the mortgage or pledge of any or all property and assets of a corporation whether or not in the usual course of business may be made upon such terms and conditions and for such consideration . . . as shall be authorized by its board of directors; and in any such case no authorization or consent of the shareholders shall be required.

However, DeWitt Farms calls attention to Neb. Rev. Stat. § 21-2078 (Reissue 1991), which reads, so far as is relevant:

> A sale, lease, exchange, or other disposition of all, or substantially all, the property and assets . . . of a corporation, if not made in the usual and regular course of its business, may be made upon such terms and conditions and for such consideration . . . as may be authorized in the following manner:
>
> (1) The board of directors shall adopt a resolution recommending such sale, lease, exchange, mortgage, pledge, or other disposition and directing the submission thereof to a vote at a meeting of shareholders, which may be either an annual or a special meeting;
>
> (2) Written or printed notice shall be given to each

shareholder of record entitled to vote at such meeting within the time and in the manner provided . . . for the giving of notice of meetings of shareholders, and, whether the meeting be an annual or a special meeting, shall state that the purpose, or one of the purposes of such meeting is to consider the proposed sale, lease, exchange, mortgage, pledge, or other disposition;

(3) At such meeting the shareholders may authorize such sale, lease, exchange, mortgage, pledge, or other disposition and may fix, or may authorize the board of directors to fix, any or all of the terms and conditions thereof and the consideration to be received by the corporation therefor. Each outstanding share of the corporation shall be entitled to vote thereon, whether or not entitled to vote thereon by the provisions of the articles of incorporation. Such authorization shall require the affirmative vote of the holders of at least two-thirds of the outstanding shares of the corporation . . . .

DeWitt Farms urges, in effect, that the mortgaging of all or substantially all of a corporation's property and assets in other than the usual and ordinary course of business is another disposition contemplated by § 21-2078 and thus requires shareholder approval.

However, in settling upon the meaning of a statute, the components of a series or collection of statutes pertaining to a certain subject matter may be conjunctively considered and construed to determine the intent of the Legislature so that different provisions of the act are consistent, harmonious, and sensible. *In re Application of City of Lincoln*, 243 Neb. 458, 500 N.W.2d 183 (1993). If there is a conflict, the special provisions of a statute prevail over the general provisions in the same or other statutes on the same subject. *AMISUB v. Board of Cty. Comrs. of Douglas Cty., post* p. 657, 508 N.W.2d 827 (1993); *In re Application of City of Lincoln, supra.*

Applying those principles, we conclude that the more specific provisions of § 21-2077 exempt the mortgaging of all or substantially all of a corporation's property and assets, whether in the usual course of business or otherwise, and thus, such may be done by a corporation's board without stockholder

approval. See *Carroll v. Wyo. Production Credit Ass'n*, 755 P.2d 869 (Wyo. 1988).

## 2. BOARD AUTHORIZATION

Notwithstanding that shareholder approval was unnecessary, because the son is the only shareholder and director of Kissinger Farms holding an ownership interest in Kissinger Feed Lots, the entity which benefited from the Metropolitan loan, we must consider the extent of any conflicting financial interest that he had in the loan and that Kissinger Feed Lots had in executing the mortgage.

In this regard several factors are worthy of note. First, Kissinger Farms had previously authorized an ongoing guarantee of Kissinger Feed Lots' debt with the PCA, which represented $770,504.15 of the debts refinanced by the Metropolitan loan. Second, the balance of the Metropolitan loan proceeds was used to refinance debts which were owed to the Federal Land Bank and Fairfield State Bank and secured by mortgages which were released as the result of the Metropolitan loan. Since the only mortgage on Kissinger Farms land prior to the Metropolitan loan was the SBA mortgage made in May 1978, it would seem that the prior Federal Land Bank and Fairfield State Bank mortgages had been secured by the Kissinger Feed Lots land, which was again pledged for the Metropolitan loan.

As a result, it is apparent Kissinger Farms benefited from the mortgage. Since it was already liable for the PCA debt of over $770,000 as a guarantor and the other debts refinanced were already secured by Kissinger Farms land, the net result was to refinance the debt of Kissinger Feed Lots into one long-term loan.

Whatever benefit Kissinger Farms may have achieved via the Metropolitan loan, it is clear that the son as a shareholder in Kissinger Feed Lots had a substantial direct benefit and personal motivation above and beyond any benefit reaped by Kissinger Farms. As a consequence, the son, in acting as a director of Kissinger Farms, had a conflicting financial interest.

We thus turn our attention to Neb. Rev. Stat. § 21-2040.01

(Reissue 1991), which declares, in pertinent part:

No contract or other transaction between a corporation and one or more of its directors or any other corporation, firm, association or entity in which one or more of its directors are directors or officers or are financially interested, shall be either void or voidable because of such relationship or interest or because such director or directors are present at the meeting of the board of directors or a committee thereof which authorizes, approves or ratifies such contract or transaction or because his or their votes are counted for such purpose if:

(1) The fact of such relationship or interest is disclosed or known to the board of directors or committee which authorizes, approves or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors;

(2) The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve or ratify such contract or transaction by vote or written consent . . . [.]

. . . .

Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or a committee thereof which authorizes, approves or ratifies such contract or transaction.

Article IV, § 11, of the bylaws of Kissinger Farms implements those statutory provisions by providing that a

contract or transaction shall not be invalidated or in any wise affected by the fact that such director or directors have or may have an interest therein which is or might be adverse to the interests of this corporation, so long as full disclosure of the adverse interest is made to the Board of Directors by the directors having such interest, and if the Board of Directors unanimously authorizes, affirms, ratifies, or approves such contract or transaction.

It is apparent from the close family relationships between the directors of Kissinger Farms, and the lack of any claim to the contrary, that the son's interest in Kissinger Feed Lots was

known to the other directors. Thus, the disclosure requirements of § 21-2040.01(1) and (2) and of article IV, § 11, of the bylaws of Kissinger Farms were met. However, since that provision of the bylaws requires unanimous director consent when any one director has a conflict, the action in writing of less than all the directors dated June 24, 1978, failed to authorize execution of the Metropolitan mortgage.

But the holdout director, Jack DeWitt, did join in the board's September 15, 1978, action in writing purporting to ratify the action reflected in the June 24 document.

Such a procedure is permitted by Neb. Rev. Stat. § 21-2042 (Reissue 1991), which provides, in relevant part:

> Unless otherwise provided by the articles of incorporation or bylaws, any action required by [law] to be taken at a meeting of the directors . . . may be taken without a meeting, if a consent in writing setting forth the action so taken shall be signed by all of the directors. . . . Such consent shall have the same effect as a unanimous vote.

In accordance with that statutory provision, article IV, § 7, of the bylaws of Kissinger Farms permits the board to act, without the holding of a meeting, through a unanimous consent in writing.

Thus, the September 15, 1978, document effectively authorizes the transaction in question if it can be said that it refers to the action reflected in the June 24, 1978, action in writing.

Article IV, § 3, of the bylaws of Kissinger Farms provides that the annual meeting of the board of directors shall be held immediately after the annual meeting of the shareholders, which, according to article III, § 1, is to occur at 9 a.m. on the last Monday in June of each year. Thus, even though the date of the June action is incomplete or unclear on the copy of the ratification contained in the record and the last Monday of that month occurred on the 26th day, it is nonetheless clear that the September document can only refer to the action in writing dated June 24, 1978. Nor is there any claim that the case is otherwise.

In the absence of any evidence that Jack DeWitt himself had

a conflict or otherwise violated his fiduciary duty to Kissinger Farms, the September 15, 1978, document effectively ratified the action taken on June 24, 1978, by making the board of directors' consent to the execution of the Metropolitan mortgage unanimous, as permitted by §§ 21-2040.01 and 21-2042 and required by article IV, § 11, of Kissinger Farms' bylaws.

## V. JUDGMENT
Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

HASTINGS, C.J., and SHANAHAN, J., not participating.