RIGEL CORPORATION, A NEBRASKA CORPORATION, APPELLEE, V. GREGORY S. CUTCHALL, APPELLANT.
511 N.W.2d 519

Filed February 4, 1994.    No. S-92-336.

Timothy J. Pugh, of McGrath, North, Mullin & Kratz, P.C., for appellant.

Frank F. Pospishil and Eric H. Lindquist, of Abrahams, Kaslow & Cassman, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

CAPORALE, J.

## I. STATEMENT OF CASE

Pursuant to the provisions of Neb. Rev. Stat. § 21-2080 (Reissue 1991), the plaintiff-appellee, Rigel Corporation, instituted this action seeking a determination of the fair value, including interest, of the shares of common stock held by the defendant-appellant, Gregory S. Cutchall, in Rigel/Chix, Inc., a corporation which was merged into Rigel. The trial court determined the fair value of such shares to be $24,640 plus interest and gave Rigel credit for the $20,000 and $132.33 in interest it had previously paid Cutchall. Cutchall appealed to the Nebraska Court of Appeals and assigned as error, in summary, the trial court's determination (1) of the fair value of the said shares of stock and (2) that Rigel was entitled to credit for the interest it had paid. We removed the appeal to this court under the power granted us by Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 1992) to regulate our caseload and that of the Court of Appeals; we now affirm the judgment of the trial court as modified herein.

## II. STATUTORY PROVISIONS

Neb. Rev. Stat. § 21-2079 (Reissue 1991) provides, among other things, that if shareholders of a corporation have taken certain specified steps, they have the right, in the event of a

merger, with an exception not relevant here, to dissent "and obtain payment for their shares."

Section 21-2080(8)(a) provides that if such a dissenter's demand for payment is not settled, "the corporation shall file in an appropriate court a petition requesting that the fair value of the shares and interest thereon be determined by the court."

Fair value is defined in § 21-2080(1)(c) to mean the value of the shares "immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of such corporate action unless such exclusion would be inequitable."

Interest is defined in § 21-2080(1)(d) to mean "interest from the effective date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans, or, if none, at such rate as is fair and equitable under all the circumstances."

### III. SCOPES OF REVIEW

While we have not previously addressed the scope of an appellate review of a trial court's determination of the fair value to be paid to a dissenting shareholder, the instant case was tried as an equitable matter.

Although a plethora of opinions in similar actions from other jurisdictions analyze the factors to be considered in arriving at the fair value to be paid dissenting shareholders, very few opinions analyze whether such a determination presents an action at law or one in equity. Furthermore, there is a split among those few jurisdictions which have passed upon the question.

The South Carolina Supreme Court held that such a matter is essentially an equitable proceeding. *Metromont Materials Corp. v. Pennell*, 270 S.C. 9, 239 S.E.2d 753 (1977). The Maine Supreme Judicial Court stated that "[t]he appraisal remedy has deep roots in equity." *In re McLoon Oil Co.*, 565 A.2d 997, 1004 (Me. 1989). In doing so, it cited 12B William M. Fletcher, Cyclopedia of the Law of Private Corporations § 5906.1 (rev. perm. ed. 1980).

However, the present edition of that treatise states: "In-court appraisal proceedings have been characterized as legal, as

opposed to equitable actions, because of their historical limitation of the dissenting shareholder to the legal remedy of damages, in the amount of the value of that shareholder's stock." 12B Fletcher, *supra*, § 5906.10 at 378 (rev. perm. ed. 1993). The treatise cites only one opinion for that proposition, a decision of the Georgia Supreme Court holding that it lacked jurisdiction for a direct appeal in a dissenting shareholder appraisal proceeding, as it was a legal action and not a case in equity. *Atlantic States Construction, Inc. v. Beavers*, 250 Ga. 828, 301 S.E.2d 635 (1983).

We have held that although rescission was originally an equitable concept, the remedy is now available in an action at law as well as in equity, and that an action seeking rescission under the Uniform Commercial Code is an action at law rather than one in equity. *Koperski v. Husker Dodge, Inc.*, 208 Neb. 29, 38, 302 N.W.2d 655, 660 (1981), declares:

> More important, however, it appears to be the general rule that where a statute provides an adequate remedy at law, equity will not entertain jurisdiction, and the statutory remedy must be exhausted before equity may be resorted to. So, when jurisdiction has become concurrent through statutory enlargement of the legal remedy, a court of equity, although recognizing the existence of its jurisdiction, will generally decline to exercise it where the remedy at law is complete and adequate, and no special circumstances exist demanding the interference of equity.

Nonetheless, we have continued to recognize some actions as equitable, although now provided for by statute. These include foreclosure, *Metropolitan Life Ins. Co. v. Kissinger Farms*, 244 Neb. 620, 508 N.W.2d 568 (1993), and *McCook Nat. Bank v. Myers*, 243 Neb. 853, 503 N.W.2d 200 (1993), and injunctions, which are provided for by Neb. Rev. Stat. § 25-1062 et seq. (Reissue 1989), but are invariably reviewed as equitable actions. *Richdale Dev. Co. v. McNeil Co.*, 244 Neb. 694, 508 N.W.2d 853 (1993), *modified on other grounds* 244 Neb. 936, 510 N.W.2d 312 (1994); *K N Energy, Inc. v. Cities of Broken Bow et al.*, 244 Neb. 113, 505 N.W.2d 102 (1993); *Village of Brady v. Melcher*, 243 Neb. 728, 502 N.W.2d 458 (1993).

As noted in part II above, § 21-2080 provides that in

determining fair value, appreciation or depreciation occurring in anticipation of a merger is to be ignored unless it would be "inequitable" to do so, and interest shall be at such rate as is "fair and equitable."

We thus conclude that the Legislature intended a proceeding to determine fair value under § 21-2080 to be equitable in nature and to be reviewed as such; we thus so treat the matter. This determination brings into play the rule that an appellate court reviews an equitable action de novo on the record and reaches a conclusion independent of the factual findings of the trial court; however, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstance that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Village of Brady v. Melcher, supra.*

At one juncture, however, we are obligated to construe a stock restriction agreement. (See part V1(a) below.) In that regard, we are bound by the rule that the construction of a contract is a matter of law, in connection with which we, as an appellate court, have an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993).

And of course, statutory interpretation is also a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below. *AMISUB v. Board of Cty. Comrs. of Douglas Cty.*, 244 Neb. 657, 508 N.W.2d 827 (1993); *Metropolitan Life Ins. Co. v. Kissinger Farms, supra.*

## IV. FACTS

Rigel operated a number of restaurants as a franchisee. Another of the three corporations involved in this matter, Chix, Inc., was the franchisee-operator of a number of restaurants for a different franchisor. Chix's owners decided to sell, and Rigel/Chix, Inc., was formed for the purpose of acquiring all of the issued and outstanding shares of Chix's common stock.

Cutchall, who served as Chix's executive vice president,

became Rigel/Chix's initial president; John Chisholm, who owned 47.1 percent of Rigel's shares, became Rigel/Chix's initial vice president; Vincent Morrissey, who also owned 47.1 percent of Rigel's shares, became Rigel/Chix's initial secretary; and Pat Kelley became Rigel/Chix's initial treasurer. (The remaining Rigel shares were owned by the Rigel Corporation Profit Sharing Plan.) Cutchall, Chisholm, and Morrissey comprised Rigel/Chix's initial board of directors.

Rigel/Chix authorized the issuance of 10,000 shares of common stock, with a par value of $1 per share. It also authorized the issuance of 15,000 shares of preferred stock at a par value of $1 per share. The preferred shares pay a dividend of $10 per year and have a redemption price of $100 per share.

Rigel purchased 8,000 of Rigel/Chix's common shares for $8,000, and Cutchall purchased the remaining 2,000 of such shares for $2,000. Rigel also purchased 8,000 shares of Rigel/Chix's preferred shares for $800,000. In order to capitalize the remainder of the purchase price, Rigel/Chix borrowed over $5.2 million from an outside lender and $200,000 from Chix.

A stock restriction agreement was executed simultaneously with the formation of Rigel/Chix and its acquisition of Chix. So far as is relevant to our review, the agreement provided that upon Cutchall's death, Rigel/Chix would purchase Cutchall's shares for the greater of $750,000 or 20 percent of the value of Rigel/Chix, as determined by an independent valuation or appraisal. Rigel/Chix was obligated to purchase and maintain a policy of life insurance on Cutchall's life

> with a death benefit of not less than $750,000 . . . to provide for payment of the value of the stock upon the death of Cutchall. Any excess of insurance proceeds over the value as determined herein shall be the sole and separate property of RIGEL/CHIX, to compensate the corporation for the loss of the skills and ability of Cutchall. It is mutually agreed that Cutchall, his personal representative, assigns or successors in interest shall have no claim to the proceeds of any policies of insurance except as set forth in this agreement.

After Rigel/Chix, through Chisholm and Morrissey,

terminated Cutchall's employment as its president and chief operating officer, it delivered Cutchall a notice of a special meeting of its shareholders to consider and vote upon a proposed plan to merge Rigel/Chix into Rigel. The plan of merger provided that the 10,000 shares of common stock in Rigel/Chix, including the 2,000 shares held by Cutchall, would be canceled and that the holders would receive payment of $10 per share. Cutchall dissented in writing to the merger and demanded that if the merger were approved, fair compensation be paid for his shares of stock.

The merger was subsequently approved at a special meeting of Rigel/Chix's shareholders. Rigel/Chix then delivered Cutchall notice of the adoption of the plan of merger, and the articles of merger were later filed with the Nebraska Secretary of State. Thereafter, Cutchall, responding to the notice that the merger had been approved, made his demand for payment of fair compensation. Rigel next notified Cutchall that his 2,000 shares of common stock had a value of $20,000 and remitted that amount to him, together with $132.33 for interest for the period which had elapsed from the effective date of the merger to the date of payment.

Cutchall then demanded payment of the claimed deficiency in Rigel's calculation of the fair value of his shares, asserting that the fair value should be $750,000.

While the parties stipulated that the value of Cutchall's shares was to be based upon Rigel/Chix's condition as of the end of its fiscal year immediately prior to the merger, they disagree as to what that value is. At trial, Cutchall's expert testified that as of the relevant date, the value of Cutchall's 2,000 shares of stock was $109,157.

Rigel's expert, on the other hand, opined that the 10,000 shares of common Rigel/Chix stock had a value of $160,000, making the value of Cutchall's 2,000 shares $32,000. However, the expert concluded that a 23-percent discount should be taken because Cutchall had but a 20-percent minority interest. In this witness' view, such a discount was necessary to account for the lack of a controlling ownership position which entitles a shareholder to set policy, appoint management, and determine dividends and compensation or to determine the sale,

liquidation, or recapitalization of the business. After applying the 23-percent minority-interest discount, the maximum value of Cutchall's shares became $24,640.

Rigel's expert then opined that a further discount of 40 percent must be applied because of the lack of marketability of the shares, it being more difficult to sell a minority interest than a controlling one in a closely held corporation. Applying that discount, he concluded that Cutchall's 2,000 shares had a maximum fair value of $14,784, which he would round to $15,000.

## V. ANALYSIS

The policy behind statutes such as §§ 21-2079 and 21-2080 is well set out in *Voeller v. Neilston Co.*, 311 U.S. 531, 535 n.6, 61 S. Ct. 376, 85 L. Ed. 322 (1941):

> At common law, unanimous shareholder consent was a prerequisite to fundamental changes in the corporation. This made it possible for an arbitrary minority to establish a nuisance value for its shares by refusal to cooperate. To meet the situation, legislatures authorized the making of changes by majority vote. This, however, opened the door to victimization of the minority. To solve the dilemma, statutes permitting a dissenting minority to recover the appraised value of its shares, were widely adopted.

With that perspective in mind, we turn our attention to the summarized assignments of error.

### 1. FAIR VALUE OF SHARES

In the first summarized assignment of error, Cutchall challenges the trial court's determination of the fair value of his 2,000 shares of common Rigel/Chix stock. He does so on two grounds: (a) that the trial court mistakenly ignored the fact that Rigel/Chix was obligated to maintain $750,000 to fund the purchase of his stock in the event of his death and (b) that the trial court incorrectly discounted the real value of his stock. We consider each of these claims in turn.

### (a) Insurance

The gist of Cutchall's argument with respect to the insurance aspect of the first summarized assignment of error is that as

under the stock restriction agreement he had a death benefit of $750,000 for which he did not have to pay, the single-premium present value of that benefit, $62,784, should have been taken into account in determining the fair value of his shares.

But the stock restriction agreement makes clear that the purpose of the insurance was to fund the Rigel/Chix purchase of Cutchall's shares in the event of his death, not to provide Cutchall's estate with a $750,000 death benefit. Indeed, the agreement expressly provides that any insurance proceeds in excess of those required to purchase Cutchall's shares would be the property of Rigel/Chix to compensate it for the loss of Cutchall's services. Moreover, the relevant provision of the stock restriction agreement contemplated that Cutchall would own the shares at the time of his death, a circumstance which obviously will not come to pass. See, *Pace Photographers (Rosen)*, 71 N.Y.2d 737, 525 N.E.2d 713, 530 N.Y.S.2d 67 (1988); *Hughes v. Sego Int'l Ltd.*, 192 N.J. Super. 60, 469 A.2d 74 (1983).

Thus, Cutchall seeks a reading of the agreement which the language will not permit. The terms of a contract are accorded their plain and ordinary meaning as ordinary, average, or reasonable persons would understand them. *Baker's Supermarkets v. Feldman*, 243 Neb. 684, 502 N.W.2d 428 (1993).

### (b) Discounts

We note at the outset of our review of the discount aspect of the first summarized assignment of error that while there is a wide disparity between the opinion of Rigel's expert concerning the value of Cutchall's shares and the opinion of Cutchall's expert, Cutchall has, except for the insurance issue just discussed, limited his attack on the trial court's valuation to the fact that it applied a discount because of Cutchall's minority position in Rigel/Chix. Accordingly, we too so limit our review of the trial court's determination of value.

We begin by noting that the statutes of the various jurisdictions have used a variety of terms in describing the payment to be made to dissenting shareholders. As observed in *Warren v. Balto. Transit Co.*, 220 Md. 478, 482-83, 154 A.2d

796, 798-99 (1959):

> In the years that have passed since appraisal statutes first came into the law (the Maryland statute passed in 1908 was one of the first), the rules governing the rights of dissenting stockholders have crystallized and are relatively uniform throughout the country. Whether the statute calls for the payment of value, fair value, or fair cash value, makes little difference since the terms are considered synonymous. *Burke v. Fidelity Trust Co.*, 202 Md. 178, 186[, 96 A.2d 254]. The real objective is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders, that is, to indemnify him. The textwriters and cases agree generally that this is to be determined by assuming that the corporation will continue as a going concern—not that it is being liquidated—and on this assumption by appraising all material factors and elements that affect value, giving to each the weight indicated by the circumstances, including the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of its stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and of the company, and good will, if any.

The Delaware Supreme Court, in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983), wrote:

> "The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, the appraiser and the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. . . ."

In a later case, when confronted with the question of whether to apply a "minority or marketability discount," the Delaware

Supreme Court said:

> [T]he Vice Chancellor concluded that the objective of a [dissenter's statute appraisal] is "to value the *corporation* itself, as distinguished from a specific fraction of its *shares* as they may exist in the hands of a particular shareholder" [emphasis in original]. We believe this to be a valid distinction.
>
> . . . .
>
> The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a *pro forma* sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144-45 (Del. 1989).

Under a similar rationale, a number of other courts have rejected both minority and marketability discounts. *Charland v. Country View Golf Club, Inc.*, 588 A.2d 609 (R.I. 1991); *In re McLoon Oil Co.*, 565 A.2d 997 (Me. 1989); *Woodward v. Quigley*, 257 Iowa 1077, 133 N.W.2d 38 (1965), *on reh'g* 257 Iowa 1077, 136 N.W.2d 280; *Hunter v. Mitek Industries*, 721 F. Supp. 1102 (E.D. Mo. 1989) (applying Missouri law). See, also, *Richardson v. Palmer Broadcasting Co.*, 353 N.W.2d 374 (Iowa 1984) (which directly discusses only the minority discount).

Several other courts have rejected the minority discount without extensively discussing the propriety of applying a discount characterized as one either for lack of marketability or because of lack of a controlling interest. *MT Properties v. CMC Real Estate Corp.*, 481 N.W.2d 383, 388 (Minn. App. 1992) (stating that "[i]t is evident this issue involves highly conflicting policy considerations. Either resolution of the issue risks unduly enlarging the value of some shares, either those of the remaining shareholders or those of the dissenter," and holding that the dissenting shareholder statute's aim is to protect the dissenting shareholder); *Walter S. Cheesman Realty Co. v. Moore*, 770 P.2d 1308 (Colo. App. 1988) (involving a dissent to liquidation, noting that discounting for lack of control would be even less appropriate upon liquidation); *Ronald v. 4-C's Electronic Packaging, Inc.*, 168 Cal. App. 3d 290, 214 Cal. Rptr. 225 (1985) (involving a valuation of a minority interest where the majority elected to buy out the minority to avoid involuntary dissolution versus a dissent to a merger or other action); *Brown v. Allied Corrugated Box Co.*, 91 Cal. App. 3d 477, 154 Cal. Rptr. 170 (1979). See, also, *Waite v. Old Tucson Development Co.*, 22 Ariz. App. 517, 519, 528 P.2d 1276, 1278 (1974) (relying upon statutory language for payment of the fair value of stock " 'based on its pro rata share of the fair value of the net assets of the corporation' ").

Still other courts, without specifically addressing a minority discount or a deduction for marketability, have held that the dissenting shareholder's shares are to be valued as a proportion of the entire corporation's value without giving any consideration to diminished marketability. *Sarrouf v. New England Patriots Football Club, Inc.*, 397 Mass. 542, 492 N.E.2d 1122 (1986); *BNE Massachusetts Corp. v. Sims*, 32 Mass. App. 190, 588 N.E.2d 14 (1992); *Dreiseszun v. FLM Industries, Inc.*, 577 S.W.2d 902 (Mo. App. 1979).

However, there is authority for allowing either a marketability deduction, a minority discount, or both. At least three courts have allowed a deduction for marketability. *Columbia Management Co. v. Wyss*, 94 Or. App. 195, 765 P.2d 207 (1988), *review denied* 307 Or. 571, 771 P.2d 1021 (1989) (allowing a marketability discount but holding a minority discount is not appropriate); *Mtr Blake v Blake Agency*, 107

A.D.2d 139, 486 N.Y.S.2d 341 (1985), *appeal denied* 65 N.Y.2d 609, 484 N.E.2d 671, 494 N.Y.S.2d 1028 (allowing a discount for marketability but not a minority discount); *Ford v. Courier-Journal Job Printing Co.*, 639 S.W.2d 553 (Ky. App. 1982). At least one decision allowed a minority discount without discussion of a marketability deduction. *Hernando Bank v. Huff*, 609 F. Supp. 1124 (N.D. Miss. 1985), *aff'd* 796 F.2d 803 (5th Cir. 1986) (construing a Mississippi dissenter's statute). And several jurisdictions have held that both a marketability discount and a minority discount may be made in calculating fair value. *Stanton v. Republic Bank*, 144 Ill. 2d 472, 581 N.E.2d 678 (1991) (resolving a prior apparent split in its courts of appeal, not expressly noted, as evidenced by *Institutional Equip. & Interiors v. Hughes*, 204 Ill. App. 3d 922, 562 N.E.2d 662 (1990); *Independence Tube Corp. v. Levine*, 179 Ill. App. 3d 911, 535 N.E.2d 927 (1989), *appeal denied* 127 Ill. 2d 617, 545 N.E.2d 111; and *Hickory Creek Nursery, Inc. v. Johnston*, 167 Ill. App. 3d 449, 521 N.E.2d 236 (1988)); *King v. F.T.J., Inc.*, 765 S.W.2d 301 (Mo. App. 1988); *Atlantic States Construction v. Beavers*, 169 Ga. App. 584, 589, 314 S.E.2d 245, 251 (1984) (emphasizing that "the trier of fact must apply any 'minority interest' factor with caution. In many cases, other factors, such as market value, may wholly or partially account for any relevant 'minority discount' "); *Moore v. New Ammest, Inc.*, 6 Kan. App. 2d 461, 630 P.2d 167 (1981); *Perlman v. Permonite Mfg. Co.*, 568 F. Supp. 222 (N.D. Ind. 1983), *aff'd* 734 F.2d 1283 (7th Cir. 1984) (applying Indiana law).

We are persuaded, however, that in the event of a merger, neither a minority discount nor a deduction for lack of marketability is to be given in determining the fair value of a dissenter's shares under the provisions of § 21-2080. Only by not doing so can the statutory policy of fully compensating a dissenting minority shareholder be achieved. Accordingly, the trial court erred in setting the fair value of Cutchall's shares at $24,640 rather than at $32,000.

## 2. Interest

With respect to the second and final summarized assignment of error, Cutchall does not challenge the 11.5-percent interest

figure used by the trial court, but correctly urges that Rigel should not have been given credit for the interest it had paid. This is so because $132.33 in interest accrued from the date the merger became effective to the date Rigel paid Cutchall the $20,000 it considered to be the fair value of his shares.

In view of the trial court's miscalculation of the fair value of Cutchall's shares, Rigel must now pay interest from the effective date of the merger at the rate of 11.5 percent per annum on the $12,000 difference between the $20,000 it paid and the $32,000 it should have paid.

## VI. JUDGMENT

For the foregoing reasons, the judgment of the trial court is affirmed as modified in this opinion.

AFFIRMED AS MODIFIED.