**CAMINO, INC., A Nebraska Corporation, Plaintiff,**

v.

**Wilda I. WILSON, Trustee of the Wolfland Trust; Wilda I. Wilson, Individually; and Kay Lynn Wilson, Defendants.**

No. 7:98CV5011.

United States District Court,
D. Nebraska.

Aug. 11, 1999.

George G. Vinton, North Platte, NE, Waldine H. Olson, Amy S. LaFollette, Nolan, Roach Law Firm, Omaha, NE, for Plaintiff.

Robert E. Roeder, Baskins, Roeder Law Firm, North Platte, NE, LeRoy Anderson, Los Angeles, CA, for Defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This interesting case explores the meaning of "fair value" under the Nebraska Dissenters' Rights law. Neb.Rev.Stat. Ann. § 21–20,137, *et seq.* (Michie 1999). After a well-tried nonjury trial by excellent lawyers for both sides, I conclude that the defendants did not receive "fair value" for their shares. Accordingly, judgment

will be entered for the defendants[1] and against the plaintiff.

## I. BACKGROUND

Camino, Inc. (Camino) owned the Camino Inn, formerly known as the North Platte Holiday Inn, in North Platte, Nebraska. When a majority of the stockholders of Camino decided to sell substantially all of the assets of the corporation, Wilda I. Wilson, Trustee of the Wolfland Trust, Wilda I. Wilson, individually, and Kay Lynn Wilson (collectively known as the Wilson family) dissented from the majority decision. They tendered their shares of stock to the corporation, received payment for the stock, and disputed that the price paid by Camino was fair. Accordingly, as required by the statute, Camino commenced an action to determine the "fair value" of the Wilson family's stock in Camino.

This action began on April 13, 1998, when Camino filed a petition in the District Court of Lincoln County, Nebraska, against the defendants. The defendants are residents of Arizona. Camino is a Nebraska corporation. On May 1, 1998, the defendants filed a notice of removal to the United States District Court for the District of Nebraska. Accordingly, this case was removed to this court based upon diversity jurisdiction. After a five-day nonjury trial in July of 1999, this case is now ripe for decision.

## II. FACTS

### A. The History of Camino

Camino was established under the laws of the State of Nebraska in 1964. It is a closely held corporation with no public market for its stock. York Hinman, now deceased, was the promoter. He sought investors to fund the cost of constructing a hotel in North Platte, Nebraska. He was successful in obtaining investors. Thereaf-

ter, stock ownership in Camino was held equally between York Hinman, Dale Miller and Bernard Wilson.

Dale Miller and Bernard Wilson died before York Hinman. York Hinman died on December 17, 1994. Respectively, one-third interests in Camino passed to the relatives of Hinman, Miller and Wilson. At all important times, the stock in Camino was held one-third in the Hinman family, one-third in the Miller family, and one-third in the Wilson family. All the shares were common voting stock entitled to one vote per share on all actions requiring shareholder approval.

At all relevant times prior to the deposit of shares in this case, there were 3,000 shares of issued and outstanding common stock of Camino owned as follows:

| | |
|---|---|
| Debra Hinman, personal representative of the Estate of Robert Hinman | 100 shares |
| Diane H. Reed | 100 shares |
| Jean A. Armstrong | 100 shares |
| Clare E. Mesmer | 100 shares |
| Robert D. Miller | 283 ⅓ shares |
| Jill A. Hepp | 383 ⅓ shares |
| Janice A. Main | 333 ⅓ shares |
| Helen W. Hinman | 600 shares |
| Wolfland Trust, Wilda I. Wilson, Trustee | 795 shares |
| Kay L. Wilson | 205 shares |

### B. Camino's Assets

The primary asset of Camino was a hotel. The first part of the hotel was constructed in 1964. Ultimately, additional rooms were added. The hotel received a Holiday Inn franchise and operated as a Holiday Inn until 1995. The property sits on the northwest corner of Highway 83 and I–80 in North Platte, Nebraska. The hotel consists of four buildings. It has 226 rooms, a restaurant, a lounge, banquet facilities and a "holidome." Everyone agrees that the highest and best use of the property is as a hotel.

The site on which the hotel is situated consists of two parcels of land totaling 21.929 acres. Of this area, 11.591 acres are deeded land and 10.338 acres are ac-

---

1. Kay Lynn Wilson has assigned her claims to Wilda I. Wilson as Trustee of the Wolfland Trust. (Ex. 183.)

cretion land. The total square footage in the buildings is approximately 118,756 and about 76,254 square feet are devoted to guest rooms. There is a parking apron and landscaping.

The land upon which the hotel is situated is zoned B–2, a business classification. The north part of the subject property is zoned F–1, a floodplain designation. A small portion of the land is also zoned for agricultural purposes.

In 1996, the hotel was assessed for tax purposes at $6.8 million. Of that value, the land accounted for approximately $740,000 and the improvements at just over $6 million. Camino appealed the assessment, and the assessment was reduced in total to $3.85 million.

Camino's hotel was built using good quality construction. At the time of the sale, it was in average to good condition. (Ex. 255 at 48.) The hotel had a remaining life of approximately 20 to 25 years; that is, the property had suffered approximately 44 percent overall physical depreciation. (Ex. 131 at 79.)

While the hotel was the most valuable asset, Camino also owned two additional tracts of vacant land. One tract, known as the Sioux Meadows property, was on the southwest quadrant of the I–80 interchange. The other property, located immediately behind and to the side of the hotel, consists of various lots in the Camino Subdivision.

### C. The Competitive Environment

Nebraska's lodging industry is centered along Interstate 80, which is a major route carrying high volumes of both commercial and pleasure traffic from coast to coast. North Platte, situated along Interstate 80, had a population of slightly over 25,000 in 1996. The city is in the west central portion of the state. Although small by national standards, North Platte is a large town by Nebraska standards. As a consequence, it hosts various conventions throughout the year, primarily attracting such business from within the state.

The North Platte economy, as measured by net taxable sales generated in the community, is growing. Sales increased significantly during the last five years, with large increases in 1994 and 1996. According to one of Camino's experts, the North Platte area had dramatic increases in lodging revenues in 1994, 1995 and 1996. (Ex. 131 at 47.)

The hotel owned by Camino is by far the largest full-service hotel in the North Platte area. The only other full-service hotel, having 146 rooms, is owned by the Wilson family and it is known as the Stockman Inn. Camino's hotel has historically attracted many conventions, and its income stream has been favorably impacted by that business.

All of the other competitors in the North Platte market are limited service hotels. For example, the Hampton Inn, a newly built hotel directly across from the hotel owned by the Camino and having 111 rooms, provides limited service; that is, it has no "in-house" restaurant and does not have convention facilities. Of the 1,563 rooms which are competitive in the North Platte market, 971 are located near the hotel owned by Camino. Camino's hotel made up 23 percent of the rooms in the area and represented 61 percent of the full-service rooms. (*Id.* at 49.)

### D. Profitability

The hotel was profitable until 1997. (Ex. 163 at 3, cols. 1–10). From 1988 through 1995 the hotel made over $200,000 in net income annually. (*Id.* cols. 1–8.) It made almost $44,000 in 1996. (*Id.* col. 9.) The hotel lost about $240,000 in 1997. (*Id.* col. 10.)

All the experts agreed that operating income, as opposed to net income, was the best measure for use in the income capitalization method of valuation. However, they defined operating income differently. One defense expert used the "EBITDA" method. (Ex. 163 at 16.) This is income before interest, taxes, depreciation and amortization. (*Id.*) Another defense ex-

pert used "NOI," or net income before interest, depreciation and amortization. (Ex. 255 at 71.) A plaintiff's expert used "stabilized income"; that is, he adjusted the historical operating data for the hotel over a three-year period (1994–1996) to account for various factors (like fluctuating occupancy and room rates) and then derived a "stabilized income" statement. (Ex. 131 at 98–104.)

The EBITDA and NOI method of evaluating operating income represents the actual performance of the hotel. In contrast, "stabilized income" is an estimate of what the hotel might earn during a hypothetical year given various assumptions. This requires the author to recast the historical data to arrive at "regenerated historic income and expense" statements and then compute "stabilized income" for a hypothetical year. (Ex. 131 at 98 & 104.) Of the three methods, the EBITDA and NOI method require the use of fewer assumptions since they rely upon historical information without manipulation of the data.

The early and middle part of the ten-year period from 1988 through 1997 was especially good. For example, the lowest EBITDA between 1990 and 1994 was $810,032. The highest EBITDA was in 1994 where the hotel generated $957,085. (Ex. 163 at 16.) The "regenerated historic income and expense" statement for 1994 was $1,033,713. (Ex. 131 at 98.) For the five-year period between 1990 and 1994, the EBITDA averaged $860,034. (Ex. 163 at 16.) The average NOI from 1988 through 1997 was about $684,800. (Ex. 163 at 3, cols. 1–10).[2]

It is clear that competition in the North Platte market increased during the latter part of the decade. Beginning in 1995, the operating income began to drop precipitously. For example, NOI fell to $550,847 in 1995, and to $371,341 in 1996. (Ex. 255 at 71.) By 1997, the NOI had dropped to approximately $41,000. (Ex. 163 at 3, col. 10.)[3] "Stabilized income" was projected to be $337,414. (Ex. 131 at 104.)

As might be expected, room occupancy percentages fell as well. The occupancy rate at the hotel was 50.53 percent in 1995, 41.64 percent in 1996 and 35.23 percent in 1997. (Ex. 131 at 53.) This decreasing rate contrasts with average annual occupancy rates during the same period of time for other hotels of between 60 and 70 percent. (*Id.* at 51.)

The average daily room charge for the hotel was $50.44 in 1995, $51.12 in 1996 and $49.33 in 1997. (*Id.* at 54.) These rates are comparable to the rates charged by competitors like the Hampton Inn and the Holiday Inn Express. (*Id.* at 52.) The Hampton Inn, with 111 rooms, and the Holiday Inn Express, with 82 rooms, entered the market during this period of decline in the Camino's revenue stream.[4]

### E. Remodeling

Camino's hotel had operated as a Holiday Inn until May of 1995, when the franchise ended. The Holiday Inn franchise could have been extended had the board of directors decided to make the property improvements required by the franchisor. At trial, a contractor estimated that the cost of bringing the Camino's hotel into compliance with the franchisor's standards was approximately $5.1 million. One of the new owners testified that they had spent more than $5.0 million on remodeling after they bought the hotel.

In 1994, the board of directors committed to a renovation plan that would have cost approximately $750,000, with the possibility of an additional $250,000 for remodeling the restaurant and lounge.

---

**2.** NOI for each year is derived by adding back interest, depreciation and amortization to the net income or loss figures. NOI for each of the 10 years is then added and the average NOI computed.

**3.** NOI is derived by adding back interest, depreciation and amortization to the net loss number for 1997.

**4.** Both the Hampton Inn and the Holiday Inn Express are limited service hotels.

While the renovation plan was not in compliance with any particular motel franchise agreement and the plan was not consummated, at the time the hotel was sold, Camino had acquired an Econolodge franchise for approximately 76 rooms. The cost of the franchise was $25,000. The hotel was constructed in such a way that one building could have been operated under an Econolodge franchise, with the remaining buildings being operated as a separate hotel. This plan would have required a minor renovation of the "Econolodge wing" of the hotel so that it either had a lobby within the building or a lobby constructed in an adjacent unused building.

### F. The Decision to Sell

In the fall of 1997, the accountants for Camino advised the board of directors that the company would likely experience a loss and that additional stockholder loans might be required. The accountants urged the adoption of a plan of action, and at this urging the hotel was ultimately sold. At that time, no shareholder wanted to inject additional money into the business.[5] As the accountants predicted, Camino lost $240,000 during 1997.

In the late fall of 1997, Camino sold the hotel for $2.837 million cash. The hotel was bought by investors who were involved in the hotel business in North Platte. One of the investors dated a friend of a Camino stockholder who was in the majority. The negotiations took less than a month and the purchasers ultimately bought the hotel for about $200,000 more than their first offer. The deal closed on January 1, 1998. The property was not listed with a broker and it was not offered publicly for sale. Camino received no other bids on the property. Another local group was interested, but could not obtain financing.

In September, shortly before Camino decided to sell the hotel, the manager quit. There had been dissension among the board of directors about the manager. The Wilson family was not satisfied with his performance because they believed that convention customers (like "Duck's Unlimited") were unhappy with the manager, refusing to patronize the hotel as a result. The other stockholders, however, were satisfied with the manager's performance.

### G. The Dispute About "Fair Value"

The dispute in this case is whether the Wilson family received fair value for the shares of stock they tendered when they refused to consent to the sale of substantially all of the assets of the corporation. They thought the $2.837 million price for the hotel was far too low.

At a special meeting of the shareholders held on January 23, 1998, it was decided that $907.81 for each share of stock held by the Wilson family was fair value. There was no effort to impose a discount for the minority interest held by the Wilsons. Accordingly, checks were written for the sum of $727,164.93 to Wilda Wilson, Trustee of the Wolfland Trust, which included $5,457.31 of interest accrued from January 1 to January 23, 1998. Another check was submitted to Kay Wilson for $187,507.93, which included $1,407.23 of interest accrued from January 1 to January 23, 1998. These checks, along with the other documents required by Nebraska law, were delivered to the Wilsons' attorney on January 23, 1998. At that same time, a check was also written to Wilda Wilson on behalf of Camino to pay her for a stockholder loan.

Subsequently, the Wilson family made a demand for payment and an estimate of fair value. They claimed the fair value of the shares was not less than $1,581.66 per share. This demand was substantially

5. Probably because Camino was an "S" corporation for tax purposes and thus could not shelter income at the corporate level, substantial dividends were paid to the shareholders during the years it was profitable. In the past, when more operating cash was required, the shareholders loaned the corporation money.

higher than the $907.81 per share they had been paid.

## H. Valuation Experts

At trial, the plaintiff and the defendants presented competent expert opinions about the value of the hotel, the vacant lots and, ultimately, the shares of stock. I found each one of the experts to be professional and well-qualified.

Cay Lacey, the plaintiff's expert, expressed an opinion that the Sioux Meadows vacant lot was worth $395,000. (Ex. 133.) On the other hand, the defendants' appraiser, James Bain, believed that the Sioux Meadows property was worth $476,000. (Ex. 170.)

As to the Camino Subdivision property near the hotel, Cay Lacey testified that the property was worth $168,000. (Ex. 132.) James Bain, on the other hand, believed the property was worth $144,000. (Ex. 171.)

As for the appraisal of the hotel, the plaintiff employed Richard Keith, a "Member of the Appraisal Institute" (MAI), to conduct an appraisal of the hotel. He believed the hotel was worth $2.7 million. (Ex. 131.) [6] The defendants employed another MAI appraiser, Frank Wilson. Wilson believed the hotel had a value of $4 million. (Ex. 255.) [7] While both of these appraisers were extremely persuasive and very competent, Wilson had greater experience appraising hotels.

Each of the parties then called certified public accountants to give valuation opinions on the stock. William Cheese, Camino's expert, prepared a balance sheet for the effective date of the transaction. (Ex. 263.) Cheese also prepared a financial statement for the hotel. Cheese considered Keith's appraisal as the most competent and therefore used it to value the hotel at $2.6 million.

The $2.6 million sum was the figure Keith found the hotel to be worth using the sales comparison approach. Cheese was uncomfortable using the income capitalization approach, which would have yielded a value of $2.7 million, according to Keith. Cheese believed that Keith did not give proper weight to the actual occupancy rate of only 35 percent for 1997 and therefore Cheese believed that Keith overstated the value of the hotel when he relied upon the income approach.

Cheese made other adjustments to the balance sheets. He added a liability of $50,000 for pollution cleanup.[8] Cheese also treated as a liability a six-percent commission that Cheese thought a real estate broker would charge for selling the underlying ground and hotel. For purposes of valuing the vacant lots, Cheese relied upon the estimates of Cay Lacey and therefore showed the vacant lots to have an aggregate value $563,000.

Cheese ultimately determined the net worth of Camino (assets minus liabilities) to be $2,599,939 on the effective date of the

---

**6.** Using the cost approach, Keith found the value to be $4.159 million. (*Id.* at 2.) Using the sales comparison approach, he found the value to be $2.6 million. (*Id.*) Keith believed the income capitalization approach was the most accurate, and that approach yielded a value of $2.7 million. (*Id.*)

**7.** Using the cost approach, Wilson found the value to be $6.8 million. (*Id.* at vii.) Wilson found the comparable sale approach to yield a value of between $4 million and $4.5 million. (*Id.*) Using the income capitalization approach, Wilson found the value to be $4.2 million. (*Id.*) Wilson then reconciled the approaches and set the value at $4 million. (*Id.*)

**8.** Under Nebraska's Petroleum Release Remedial Action Act, Neb.Rev.Stat. Anns. §§ 66–1501 to –1531 (Michie 1995 & Supp.1998), cleanup costs are reimbursed by the State of Nebraska after $25,000 has been paid by the responsible party. In fact, there was evidence that two petroleum pollution sites had been located on the premises where an old gas station had been located. (Ex. 134, Attachment F–1.) Cheese assumed that Camino would have to clean up the two areas, and that such efforts would cost at least $25,000 per site. (*See id.* at 2 ¶ 8.)

transaction. · (Ex. 263.) Therefore, the value of the stock was approximately $866.65 per share ($2,599,939 divided by 3,000). Since the defendants received $907.81 per share,·Cheese was of the opinion that no additional amounts should be paid to the dissenting shareholders.

Thomas Pastore, another well-qualified valuation expert, testified that he believed the value of Camino was $5,832,975. (Ex. 163, Transmittal Letter at 2.) Pastore therefore concluded the stock had a value of approximately $1,944.33 per share.

For valuation of the hotel, Pastore relied primarily on Wilson's appraisal, although Pastore substantially increased the value of the hotel because he thought Wilson had unduly relied upon the low income stream following loss of the Holiday Inn franchise. Pastore believed that the best method of determining fair value was to examine the income earning potential of the property.

Since Pastore believed that the hotel could be refranchised at a fairly low cost, he examined the net operating income of the hotel from 1990 through 1994 when the hotel had a franchise. For that five-year period of time, he calculated an average ·EBITDA of $860,034. Using a capitalization rate of about 13.15 percent (which everyone agrees is appropriate), Pastore concluded that the value of the hotel was $6,536,256 [9] prior to renovation. (*Id.* at 18.) (7.6 (100% divided by 13.15%) × $860,-034.)

Pastore then deducted estimated capital expenditures for remodeling of $1 million. Pastore stated that he agreed with the board of directors' 1994 decision to remodel the hotel by spending up to $1 million.

He thus based his remodel estimate partly on the board's decision and partly on his experience of what it would take to obtain a competitive franchise.

Pastore then took Bain's values for the vacant lots and added those to the balance sheet. Pastore did not increase liabilities for selling commissions or cleanup costs because he believed the law required the valuation to be conducted as if the business was ongoing. If the business was ongoing, Pastore assumed that no cleanup costs or commissions would be incurred.

As between the two CPA valuation experts, I was most persuaded by Pastore's testimony. He had more experience with *complex contested valuation cases.* While I disagree with the period of time Pastore used to derive an income stream (1990–1994), I believe the capitalization of income approach for an operating business like the hotel is a *far more accurate method* of determining value than the comparable sales approach relied upon by Cheese. In fact, both hotel appraisers (Keith and Wilson) agreed that the income capitalization method was generally the most accurate approach.

## III. ANALYSIS

With exceptions not pertinent here, a shareholder in an ordinary Nebraska business corporation has a right to dissent from the decision of the majority of shareholders to sell substantially all of the corporation's assets. Neb.Rev.Stat. Ann. § 20–20,138(c) (Michie 1999).[10] In such a case, the dissenting shareholder is entitled to "fair value" for his or her stock. Neb.

**9.** Pastore's math may be off by two dollars. The correct number appears to be $6,536,258.

**10.** Although the parties did not present much evidence on the point, Camino apparently did not intend to distribute substantially all the proceeds of sale to the shareholders. Thus, Camino could not take advantage of the exception for cash sales where substantially all of the net proceeds of sale are distributed to shareholders within one year. *See* Neb.Rev. Stat. Ann. § 21–20,138(c) (providing an ex-ception to the right to receive "fair value" where the sale is for cash and all or substantially all of the net proceeds of the sale are distributed to the shareholders within one year). Since Camino had current liabilities and loans to stockholders in excess of $365,-000, Camino could not have distributed substantially all of the net proceeds of sale unless it ignored the rights of creditors, some of whom were shareholders.

Rev.Stat. Ann. § 21–20,137(4) (Michie 1999). Here, everyone agrees that the parties have complied with Nebraska's law and the only question is "fair value."

### A. The Meaning of "Fair Value"

"Fair value, with respect to a dissenter's shares, shall mean the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." *Id.* Although there is not a lot of Nebraska case law on the subject, the Nebraska Supreme Court has outlined the basic principles that apply to the "fair value" question. *Rigel Corp. v. Cutchall,* 245 Neb. 118, 511 N.W.2d 519 (1994) (merger).[11] *See also Stoneman v. United Neb. Bank,* 254 Neb. 477, 577 N.W.2d 271 (1998) (even where the Dissenters' Rights statute does not apply because the corporation is an exempt banking entity, minority shareholders have a right to "fair value" that arises from Nebraska equitable principles).

■■■ The Nebraska Supreme Court first made it clear that a "fair value" determination under the statute is nevertheless equitable in nature. *Rigel,* 245 Neb. at 122, 511 N.W.2d at 522. In this context, the court explained the policy behind the statute. At common law, a minority could arbitrarily frustrate the will of the majority. In response, legislatures modified the common law and provided that a majority could make fundamental changes in the corporation, even in the face of minority objection. In turn, and in order to avoid victimization of the minority, "fair value" statutes were adopted. *Id.* at 125, 511 N.W.2d at 523–24 (quoting *Voeller v. Neilston Warehouse Co.,* 311 U.S. 531, 535 n. 6, 61 S.Ct. 376, 85 L.Ed. 322 (1941)). Thus, the "fair value" law was adopted to " 'solve the dilemma' " by statutorily permitting the majority to be free from a potentially

arbitrary minority while protecting the minority from a potentially abusive majority. We should keep "that perspective in mind." *Id.*

■■■ The court then stated that the " 'real objective is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders, that is, to indemnify him.' " *Id.* at 127, 511 N.W.2d at 524 (quoting *Warren v. Baltimore Transit Co.,* 220 Md. 478, 482–83, 154 A.2d 796, 798–99 (1959)). In this regard, one examines all " 'material factors and elements that affect value' " such as " 'the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of its stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and of the company, and good will, if any.' " *Id.* at 127, 511 N.W.2d at 524–25.

■■■ While the search for "fair value" is wide-ranging, one does not impose discounts for lack of control (minority ownership) or lack of marketability (not publicly traded) since these reductions would allow the majority to victimize the minority. *Id.* at 128–30, 511 N.W.2d at 524–26. Moreover, the stock is valued " 'by assuming that the corporation will continue as a going concern—not that it is being liquidated.' " *Id.* at 127, 511 N.W.2d at 524 (quoting *Warren v. Baltimore Transit Co.,* 220 Md. 478, 482–83, 154 A.2d 796, 798–99 (1959)).

To summarize, when determining "fair value" of corporate stock under the Nebraska Dissenter's Rights statute: (1) the determination of "fair value" is equitable in nature; (2) the law permits the majority to be free from a potentially arbitrary minority while protecting the minority from a potentially abusive majority and the stat-

---

11. For a comprehensive examination of "fair value," see Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value,* 47 Duke L.J. 613 (1998).

ute should be applied to effectuate that purpose; (3) the objective is to ascertain the actual worth of that which the dissenter loses because of his unwillingness to go along with the controlling stockholders; (4) one considers all material factors that affect value, such as the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of the stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and the company, and good will, if any; (5) discounts for lack of control or lack of marketability are not proper; and (6) the stock is valued by assuming that the corporation will continue as a going concern and not as if it is being liquidated.

### B. "Fair Value" Applied

Applying the Nebraska statute and the *Rigel* principles to the facts, I am persuaded that on January 1, 1998, (the day the disputed transaction closed) Camino had a value of $3,740,719. This amounts to a value of $1,246.91 per share of stock ($3,740,719 divided by 3,000 shares). My reasons for this decision are set forth below.

■ To begin with, I am not bound to choose one of the values given by the experts, as opposed to arriving at a different conclusion. Nothing in Nebraska's substantive law or the Federal Rules of Evidence suggests that I am bound to pick one expert's opinion of value. For good reason, the concept of requiring a trial judge to select one of the values proposed by the parties has been attacked as unworkable under the present state of the law. *See* Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. at 697 ("The choose one party's valuation concept can only work if it is uniformly and consistently applied so that the

12. It is unnecessary to address other arguments raised by the parties. If I did so, this

parties know what to expect when they put on valuation evidence. This probably would require either a legislative directive, or at least, the pronouncement of a firm rule from a state's supreme court. Neither has occurred.").

In order to decide the value per share, a balance sheet for Camino on the valuation date had to be prepared. Using my estimate of the value of the hotel, the Sioux Meadows property and the Camino Subdivision property, disallowing the claimed deductions for cleanup costs and commissions proposed by the plaintiff, but otherwise adopting the balance sheet (Ex. 263 (handwritten column)) authored by the valuation expert for Camino, the following balance sheet was prepared:

Camino Balance Sheet
1/1/98

| Assets: | |
|---|---|
| (1) Total Current Assets | $ 42,381 |
| (2) Hotel | 3,500,000 |
| (3) Sioux Meadows | 420,000 |
| (4) Camino Sub. Lots | 144,000 |
| Total Assets: | $4,106,381 |
| Liabilities: | |
| (1) Current Liabilities | $ 200,662 |
| (2) Loans from Shareholders | 165,000 |
| Total Liabilities: | $ 365,662 |
| Value Per Balance Sheet | |
| Assets | $4,106,381 |
| Liabilities | − 365,662 |
| Shareholder Equity | $3,740,719 |

There are five main [12] issues with regard to this valuation decision. Those arguments relate to: (1) the value of the hotel; (2) the value of the Sioux Meadows property; (3) the value of the Camino Subdivision lots; (4) whether cleanup costs should be added as a liability; and (5) whether real estate commissions should be added as a liability. I shall address those issues next and explain how I resolved them.

opinion would be unnecessarily lengthy.

## 1. The Hotel

For the hotel, I arrived at a value of $3.5 million. Accordingly, I used that value to prepare the balance sheet.

The $3.5 million figure exceeded the sale price of $2.837 million. It also exceeds the valuation of the plaintiff's expert Keith, who set the value at $2.7 million. In addition, it exceeds the valuation of the plaintiff's other expert, Cheese, who testified that the hotel was worth $2.6 million.

On the other hand, my conclusion is less than the $3.85 million the hotel was valued at for tax purposes. It is also less than the $4.0 million or $5.832 million that the defendants' experts gave as values. The $3.5 million value is also less than the average of the four opinions given at trial ($3.78 million). It is also less than the average of the four trial opinions, the sales price and the valuation for tax purposes ($3.64 million).

■ I arrived at the value of the hotel in the following manner. First, I agree with the majority of the experts who testified that the income capitalization approach is the most accurate method of establishing the value of an operating business like the hotel, provided that it is checked against other methods as a safeguard. *See In Re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.,* 725 A.2d 927, 931–32 (1999) (valuation of a hotel under Vermont's Dissenter's Rights statute in a merger case; affirming trial court's use of the discounted cash flow method which is similar to the income capitalization approach). Second, I agree with Pastore, the defense expert, that a capitalization rate of 13.15 percent (or a factor of 7.6) is a proper rate to use.[13] Third, I agree with the plaintiff's experts that the income stream after the loss of

the franchise is the most accurate measure of value because it accounts for the loss of the franchise and the increased competitive environment. Income streams before 1995 therefore overstate the value of the hotel since those streams represent the hotel's functioning while franchised and under less intense competition. Fourth, I do not agree with the plaintiff's experts that it is proper to use the 1997 income stream as a measure of value since the management of the hotel was in turmoil (the manager quit under fire) and the board of directors was engaged in a heated dispute about what to do with the hotel. As a result, the 1997 income stream is not fairly representative of the income-producing capacity of the business. Fifth, I agree with Wilson, a defense expert, that the most accurate estimate of operating income is historical NOI, as opposed to the EBITDA method proposed by Pastore or the "stabilized income" method proposed by Keith. Sixth, I do not think the actual sale price of the hotel ($2.837 million) is an accurate indicator of value since only one bid was received, the bid came from a group consisting of a person who dated a friend of a member of the majority of the stockholders, attempts to sell the hotel were made over a very short period of time, the hotel was not publicly offered for sale and no broker was used.

■ As a consequence, I used an average income stream derived from the 1995 and 1996 years. In 1995 the NOI was $550,846.[14] (Ex. 255 at 71; Ex. 163 at 3, cols. 8–9.) The NOI for 1996 was $371,339. (*Id.*) Thus, the average NOI for this period was $461,093. Capitalized at 13.15 percent, an income stream of $461,093 suggests that a buyer of a hotel would be willing to pay about $3.5 million (7.6 × $461,093=$3,504,307) for the property.[15]

---

13. The higher the capitalization rate (expressed as percentage), the lower the purchase price. Pastore's rate was the highest rate proposed by the experts and it therefore is the most conservative.

14. The Holiday Inn franchise ended in May of 1995. Therefore, the NOI for most of the year was generated without a franchise.

15. All of the experts used rounding conventions because to do anything else implies a precision that does not exist. I did too.

To check this figure, I searched for comparable sale data. The best and most comparable sale was the Ramada Express hotel in Ogallala, Nebraska. (Ex. 131 at 87, 94, col. 6; Ex. 255 at 51–52.) This hotel was a full-service hotel with 151 rooms situated on Interstate 80. Of all the comparable sales used by Keith and Wilson, this sale was obviously the most comparable. As Keith, Camino's expert, stated: "This sale, which is located in a smaller Nebraska town, is similar to the subject, and has interstate highway influence." (Ex. 131 at 87.) The Ogallala hotel was the largest full-service hotel (yet smaller than the Camino's) used as a comparable sale by either appraiser. It was also the closest geographically to North Platte.

Using a price-per-room calculation of $15,232 for that Ogallala sale (sales price of $2.3 million divided by 151 rooms) (Ex. 131 at 87), the Camino hotel should have sold for about $3.44 million. (226 rooms × $15,232 = $3,442,432.) [16] This comparable sale approach, indicating that Camino property should have sold for about $3.44 million, supports a valuation using the income method of $3.5 million.

I also checked the $3.5 million valuation against the cost of replacing the hotel. Those costs ranged from a low of about $4.2 million to a high of about $6.8 million. As a result, the $3.5 million valuation is clearly within bounds.[17]

Camino argues that I must consider the 1997 year for income analysis purposes, but it also argues that I should not consider the high years like 1994. Obviously, since the NOI for 1997 was nominal, if I were to use this year, I would substantially reduce the value of the hotel. I reject this argument because it disregards the fact that 1997 was not typical. For example, in 1997 the hotel lost its manager and the board was fighting about what to do with the property.

That this was an atypical year is reflected by the fact that: (1) the hotel was profitable until 1997 (Ex. 163 at 3, cols. 1–10); (2) from 1988 through 1995 the hotel made over $200,000 in net income annually (id. cols. 1–8); and (3) it made almost $44,000 in net income during 1996 (id. col. 9). If the plaintiff thinks it appropriate to consider the one year when the hotel lost money and had a very low NOI, then it is surely appropriate to consider all the good years when the net income was positive and the NOI was much higher. If this were done, the average NOI is approximately $684,800 over the ten-year period extending from 1988 through 1997. (Ex. 163 at 3, cols. 1–10). If one were to use this number, the hotel should have sold for nearly $5.2 million (7.6 × $684,800 = $5,204,480).

Moreover, if one were to use the period of 1994 (a very good year) through and including 1997 (a very bad year), the average NOI is about $480,000. (Ex. 163 at 3, cols. 7–10). If that income stream is used, the hotel should be valued at about $3.64 million (7.6 × $480,000 = $3,648,000).

In short, for purposes of deciding fair value, an extreme in the data should be disregarded when it reflects an atypical situation. Just as I should disregard the income stream for 1994 (the highest year)

Thus, unless I adopted an expert's finding of value as my own, when making final conclusions about value, I rounded down to the nearest $10,000 when dealing with the hotel and the nearest $5,000 when dealing with the other properties. Consequently, a value of $3,504,307 is rounded to $3.5 million.

16. Even reducing the price per room to $14,948, as proposed by the plaintiff's expert Keith to account for differences between the Ogallala sale and the Camino hotel (Ex. 131 at 94, col. 6), the Camino hotel should have sold for at least $3.37 million. (226 × $14,948 = $3,378,248.)

17. All the experts agreed that the replacement cost method was the least accurate indicator of value since it does not represent what the property can make if operated or what the property will bring if sold. Consequently, replacement cost is used to define the outside parameter of value.

because all that income was earned using a franchise that no longer exists, I should disregard the other extreme represented by 1997 when the hotel manager quit and the board of directors were fighting.

■ Camino also argues that a value in excess of the $2.837 million sales price does not account for the $5.1 million cost of remodeling the hotel to obtain a Holiday Inn franchise. There are two responses to this argument. Initially, the evidence convinces me that a competitive franchise could be obtained without incurring the substantial remodeling costs of a Holiday Inn franchise. In fact, Camino had obtained an Econolodge franchise shortly before it sold the hotel and the remodeling costs of obtaining that franchise would have been minimal. Furthermore, in 1994 the Camino board of directors believed that the hotel could be updated for between $750,000 and $1 million and thereby remain competitive. This board consensus tends to suggest that remodeling costs in the $5.1 million range are not required.

On the other hand, if the test is to decide whether the hotel could support a Holiday Inn franchise with a $5.1 million remodeling price tag and still produce a value substantially in excess of the $2.837 million sales price, the evidence indicates that it could. For example, if one uses the last full year of operation under the Holiday Inn franchise (1994), the "regenerated income and expense" statement for the hotel prepared by the plaintiff's expert Keith was $1,033,713. (Ex. 131 at 98.) Keith proposed a capitalization rate of 12.5 percent, or a factor of 8. (*Id.* at 108.)[18] Using these assumptions, the hotel should sell for $8,269,704. (8 × $1,033,713.) If so, the hotel should have a value of about $3.2 million after deducting the cost of the improvements required by the Holiday Inn franchisor. ($8.3–$5.1=$3.2.)

■ Camino also points out that the new owners spent more than $5.0 million to do remodeling. Although this information is not irrelevant, it is not very helpful either. The valuation date set by statute is *before* the date of the actual transaction and "depreciation in anticipation of the corporate action" should not be considered unless the failure to so would be inequitable. Neb.Rev.Stat. Ann. § 21–20,137(4). Consequently, post-sale data regarding the asset in controversy must be scrutinized with great care, or "fair value" is simply the product of the sales price, and that would obviously defeat the purpose of the statute. In other words, the "tail" must not be allowed to "wag the dog."

More importantly, the fact that the new buyers spent a large amount to remodel does not mean that the $2.837 million price they paid for the hotel was fair or that $5.0 million had to be spent to acquire a competitive franchise. On the contrary, because the sale is suspect—the hotel was not offered for sale to the public, the deal was done in a short period of time, no broker was used, no other offers were received and one of the buyers dated a friend of a stockholder in the majority group—little reliance should be placed on that data.

Furthermore, the fact that the buyers actually invested about $5.0 million to do the remodeling suggests the purchase price was in fact low. If the property had been fully marketed for a sale such that there were competing buyers who were bidding against each other to buy the hotel, the 1994 income stream, generated when the hotel had a Holiday Inn franchise, would have provided a strong incentive to offer much more than $2.837 million. As indicated earlier, if the 1994 income stream was used, and the plaintiff's expert's assumptions are followed, a purchaser could afford to pay about $3.2

---

**18.** Although the rates were close, Keith, the plaintiff's expert, proposed a capitalization rate (12.5% and multiple of 8) that was more generous than the one proposed by Pastore (13.15% and multiple of 7.6), the defense expert.

million and still spent $5.0 million remodeling.

Camino argues, in addition, that I have failed to account for the increased competition in the marketplace since I did not use the 1997 operating income for the hotel.[19] This is not accurate. The income stream that I have used reflects the major change in the market caused by the additional competition provided by the Hampton Inn directly across from the Camino hotel. Still further, the competitive changes relied upon by Camino come from the addition or remodeling of limited service hotels. Since those hotels cannot substantially compete with the Camino hotel for convention business, since convention business is a major component of the historical income stream of the hotel, and since the Camino holds a near monopoly of the convention business in the North Platte area, the plaintiff overstates the impact of increased limited service competition.

To sum up, the hotel was worth $3.5 million on the effective date. The capitalization of income approach was used to arrive at this value, and most experts agree that this method is the most accurate. This value is derived from using an income stream that relies upon neither excessively good nor excessively bad years. The capitalization rate (13.15%) that was used is accepted by all the experts as reasonable. The operating income definition (NOI) that was used is the most conservative of the various methods proposed by the experts. The data used to drive the valuation is historical and required no manipulation. The $3.5 million conclusion is consistent with the value that would have been generated using the most comparable sale ($3.44 million). The valuation is within bounds as measured by every expert's replacement cost analysis. The $3.5 million conclusion is less than, but relatively close to, the average ($3.64 million) of the values given by the experts at trial, the tax valuation and the actual sales price.

## 2. The Sioux Meadows Property

The Sioux Meadows land is a vacant lot consisting of about 13.60 acres. It is located in the southwest quadrant of the I–80 interchange. Accordingly, the property has good potential for commercial use.

The plaintiff's expert, who relied upon the comparable sale approach to decide value, examined six comparable sales. From these sales, she derived a value per acre of $29,000 and total value of $395,000 for the tract. (Ex. 133 at 46.) The defendant's expert used the comparable sales approach as well. He examined eight sales. From these transactions, he derived a value per acre of $35,000 and a total value of $476,000. (Ex. 170 at 45.)

This property was difficult to appraise since all but two of the sales relied upon by both appraisers were tracts of land under six acres and the subject tract exceeded 13 acres. The tract most similar in size and relied upon by both appraisers consisted of 17.9 acres and sold for $19,512 per acre. (Ex. 133 at 45 (sale 4); Ex. 170 at 45 (sale 4).) Both appraisers agree that this sale must be adjusted upward to account for differences between that sale and the subject property. Furthermore, I agree with the plaintiff's expert that "[a]fter adjustments, this sale is considered to be very similar to the subject parcel." (Ex. 133 at 46.) She adjusted the sale upward and derived a price per acre of approximately $31,000. (*Id.* at 45.) I am persuaded that this represents an appropriate adjustment.

Accordingly, since small tracts of land tend to overstate the value per acre, and since the sale that is closest in size to the subject parcel indicates a value of about $31,000 per acre, I am persuaded that the value of the Sioux Meadows property is

---

**19.** In this regard, I am in good company. Wilson and Pastore, the defense experts, did not use the 1997 data when they capitalized income. Similarly, Keith, the plaintiff's expert, did not use the 1997 data to capitalize income either. (Ex. 131 at 98–104.)

$420,000 ($31,000 × 13.60=$421,600 [20]). I have therefore used that sum to decide the value of the stock.

### 3. The Camino Subdivision Lots

The other vacant property, located immediately behind and to the side of the hotel, consists of various lots [21] in the Camino Subdivision. The defendants' appraiser, Mr. Bain, arrived at the lowest number. He was also the most familiar with this property. Familiarity with this property is especially important because it has many odd features, such as being partially situated in a floodway. I was persuaded by Bain's analysis, and therefore adopt his finding of value. Bain found the property to be worth $144,000. (Ex. 171.) Therefore, I used that value in the corporate balance sheet.

### 4. Pollution Cleanup

 Camino argues that I must reduce the value of the corporation, and thus the stock, because of pollution that has been located at the hotel. Cheese, Camino's expert, estimated that it would cost $50,000 to remedy the situation. While I agree that pollution has been located at the site, the evidence is insufficient to require a charge to the balance sheet. Accordingly, I decline to reduce the value as suggested by Camino.

The evidence is undisputed that pollution was discovered as a result of the contested sale. (See, for example, Ex. 131, Addenda, Phase II Site Assessment; Ex. 134, Attachment F–1, Phase II Environmental Study.) However, the pollution "appears to be low level hydrocarbon contamination." (Ex. 134, Att. F–1 at 1.) Furthermore, there is no evidence of "excessive vapor levels" or "any risk of explosion." (*Id.*) Still further, there was "[n]o evidence ... of any adjacent drinking water supplies that might be at risk from this hydrocarbon occurrence." (*Id.*)

According to the environmental consultant, the "site contamination likely would be considered relatively low priority by [the regulator]." (*Id.* at 2.) Importantly, "it is not possible to predict with any certainty what a regulatory agency might do in the future" and a "risk-based closure of the case, with no environmental cleanup costs" was as probable as any other result. (*Id.*) In fact, the "most likely future costs of this contamination would appear to be low ... zero to possibly several thousand dollars for some type of monitoring scenario ...." (*Id.*)

In summary, the evidence is far too speculative to justify a charge to the balance sheet. Accordingly, I reject Camino's argument that the value of the corporation must be reduced by $50,000 to account for a potential environmental liability.

### 5. Real Estate Commission

Camino argues that I should deduct from the balance sheet a six percent real estate commission that the corporation might pay if the underlying assets were sold. I reject that argument for two reasons.

 First, *Rigel* makes it clear that the stock is valued " 'by assuming that the corporation will continue as a going concern—not that it is being liquidated.' " *Rigel,* 245 Neb. at 127, 511 N.W.2d at 524 (quoting *Warren v. Baltimore Transit Co.,* 220 Md. 478, 482–83, 154 A.2d 796, 798–99 (1959)). Moreover, the "fair value" statute indicates that the anticipated financial impact of a challenged sale on the value of the corporation cannot normally be used to reduce the value to which the minority dissenter is entitled. Neb.Rev.Stat. Ann. § 21–20,137(4) ("fair value" is determined by "excluding any ... depreciation in anticipation of the corporate action unless exclusion would be inequitable"). As a consequence, and absent unusual equitable

---

20. See note 15, *infra.*

21. The appraisers used slightly different legal descriptions to describe this land. I found those differences to be inconsequential.

issues, costs of sale, like real estate commissions, should not be charged to the minority when the minority objects to the sale that may produce the cost. Here, there are no compelling equitable reasons to impute a commission, and, as discussed next, there is a compelling equitable reason not to do so.

Second, at least to the extent of the $2.837 million purchase price, it would be manifestly unfair to include a commission when in fact no such fee was or will ever be paid. Camino did not use a broker to make the challenged sale. Imputing a hypothetical commission on that sum would amount to a windfall for the majority since it would reduce the balance sheet value of the corporation, but it would not reduce the actual cash in the corporation to which the majority would be entitled.

In summary, the law does not permit me to impose a commission on the balance sheet by treating the corporation as if it were in liquidation. Moreover, at least to the extent of the actual purchase price, the imputation of a commission, when none will ever be paid, is unfair to the minority.

### C. The Defense of Inequity

 I next address, albeit briefly, Camino's argument that the Wilson family has acted unfairly and therefore I should penalize them by preventing them from arguing that the value of the hotel exceeds the actual purchase price. Camino's first argument runs something like this: the Wilsons did not want to invest the money needed for a Holiday Inn franchise, and, therefore, they should not be allowed to argue that the hotel should be valued as if it had a franchise. I reject this argument.

It was perfectly appropriate and consistent for the Wilson family to refuse to consent to spending Camino's money for a Holiday Inn franchise while contending that the sale price of $2.837 million was too low. Put simply, a position on the one issue (what should we spend) does not rationally dictate a particular position on the other issue (what should they pay).

Two examples illustrate the point. As noted earlier, another competitive franchise could have been obtained for far less than the $5.1 million price tag that went along with maintenance of the Holiday Inn franchise. Witness the fact that an Econolodge franchise had been obtained at very little cost. Still further, and as again noted earlier, using the assumptions presented by Camino's expert, the hotel could have sold for much more than $2.837 million while still affording a $5.1 million remodel job if 1994 earnings (the last year the hotel operated under the Holiday Inn "flag") were used. Consequently, the fact that the Wilson family went along with the majority and decided not to invest in a Holiday Inn franchise does not mean that the Wilson family is also required to accept the majority's decision about what the hotel is worth.

Camino next argues that in October of 1997 the Wilson family was not willing to spend the money necessary to implement the Econolodge franchise. As a result, Camino argues that they should be prohibited from arguing that the hotel should be valued as if franchised. For the same reason that I was not persuaded by this argument when asserted in the context of the Holiday Inn franchise remodeling issue, I am not persuaded by this argument asserted in the context of the Econolodge franchise. More importantly, it is clear that the Wilson family was hesitant to act on the Econolodge franchise because the board of directors was in turmoil over whether to sell the property. The possibility of a sale had been discussed between Kay Wilson and Jill Hepp as early as September of 1997. In this circumstance, it was prudent for the Wilson family to wait to see what would happen. As it turns out, had the money been spent, it would have been wasted since the majority elected to sell the hotel shortly thereafter and the Econolodge franchise was not pursued by the new owners.

Next, Camino argues that Kay Wilson made statements to other directors that

the hotel was not worth very much. More-over, Camino suggests that the Wilson family was trying protect its interest in the Stockman Inn, a competitor, by seeking to frustrate the sale of the Camino hotel. Suffice it to state that Kay Wilson's comments, even if made [22], are taken out of context and there is absolutely no evidence that would permit me to draw a fair inference that the Wilson family tried to promote the Stockman Inn by frustrating the sale of the Camino hotel.

In summary, the Wilson family did not act inequitably. Therefore, there is no basis upon which I could prohibit them from making their claims.

### D. Attorney Fees and Interest

The court is given the statutory power to "assess the attorney's fees and expenses and the fees and expenses of experts for the respective parties in amounts the court finds equitable." Neb.Rev.Stat. Ann. § 21-20,150(2) (Michie 1999). There are two alternative conditions.

First, lawyer and expert fees may be imposed against the corporation if the corporation did not substantially comply with the Dissenters' Rights law. Neb.Rev.Stat. Ann. § 21-20,150(2)(a). Second, lawyer and expert fees may be imposed against either the corporation or the dissenter if that party "acted arbitrarily, vexatiously, or not in good faith" with respect to the rights guaranteed by the statutory scheme. Neb.Rev.Stat. Ann. § 21-20,-150(2)(b).

In this case, it is undisputed that Camino and the Wilson family complied with the Dissenters' Rights law. Moreover, I am satisfied that both parties acted in good faith and none of them acted arbitrarily or vexatiously. Consequently, I decline to award attorney or expert fees to either side.

Next, dissenters, like the Wilson family, are entitled to the "fair value of his or her shares, plus interest." Neb.Rev.Stat. § 21-20,149(5) (Michie 1999). "Interest shall mean interest from the effective date of the corporate action until the date of payment at the rate specified in section 45-104, as such rate may from time to time be adjusted by the Legislature." Neb. Rev.Stat. Ann. § 21-20,137(5) (Michie 1999). In this case, the parties have agreed that the effective date of the disputed transaction was sometime on January 1, 1998, and they have used that date for valuation purposes. Accordingly, interest began to accrue from that date. Finally, the rate of interest is 12 percent. Neb. Rev.Stat. Ann. § 45-104 (Michie 1995).

## IV. CONCLUSION

The Wilson family owned 1,000 shares of stock. They were paid $907.81 per share plus interest. I have determined that the stock was worth $1,246.91 per share. Thus, the Wilson family is entitled to an additional sum of $339.10 ($1,246.91–907.81) per share. This means they are entitled to recover $339,100 (1,000 × $339.10) plus interest at 12 percent from January 1, 1998.

Accordingly,

IT IS ORDERED that:

1. Judgment will be entered, by separate document, for the defendants and against the plaintiff providing that the plaintiff shall pay the defendants the sum of $339,100 plus interest at the rate of 12 percent from January 1, 1998, until paid.

2. Costs of suit shall be taxed to the plaintiff. The Court declines to award attorney or expert fees to any party.

3. The plaintiff's motion to submit a post-trial brief (filing 69) is granted, and the court has considered that brief in arriving at this decision.

---

22. She denies making some of the statements and claims others were taken out of context. Wilson is a lawyer who holds an MBA. In general, I found her denials and explanations to be credible.